**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael McLEMORE,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Michael SUGG,**
**Defendant-Appellant.**

**Nos. 77–1044 and 76–2143.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 26, 1978.

Decided March 20, 1978.

Rehearing Denied in No. 2143 May 2, 1978.

Charles Louis Roberts, El Paso, Tex. (Joseph Abraham, Jr., of El Paso, Tex., and C. Rabon Martin of Baker, Baker & Martin, Tulsa, Okl., on the brief), for defendants-appellants.

Kenneth P. Snoke, Asst. U. S. Atty., Tulsa, Okl. (Nathan G. Graham, U. S. Atty., Tulsa, Okl., with him on the brief), for plaintiff-appellee.

Before McWILLIAMS, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

These appeals are from judgments of conviction entered against appellants in the United States District Court for the Northern District of Oklahoma after a trial to the Court. Each appellant-defendant was convicted of unlawful possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

There is one general issue on appeal, whether seizure of marijuana after an arrest without a warrant and made the basis of the prosecution was unlawful, in violation of defendants' Fourth Amendment rights. The large quantity of marijuana taken from defendants was the entire foundation for the conviction. If we find the search unlawful, we are required to find the evidence inadmissible under *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and its successor cases, and to reverse and remand.

The facts are essentially undisputed; what is in issue is their legal sufficiency to justify the actions taken by the federal officers. Evidence was presented to the trial court on the circumstances surrounding the arrest and search. The rest was stipulated. We state the relevant facts here rather fully.

Appellant-defendant Michael McLemore called one William Christensen, operator of Tulsa Lease-A-Plane at a Tulsa, Oklahoma, airport some time before March 29, 1976, to inquire if he leased airplanes for trips to Mexico. Upon being given an affirmative answer McLemore rented a plane with 600-pound cargo capacity on March 29, 1976.

The destination on the lease form was stated to be Hermasillio, Mexico. He was gone until April 9. The lease arrangement provided he would receive credit against the bill for gas purchased during the trip, upon presentation of receipts.

Upon returning McLemore told Christensen he had not gone to Mexico as originally planned, but had stayed in New Mexico, where the receipts showed he had purchased gas. Christensen noted that McLemore had put 17 hours on the aircraft and that the gas receipts were short by approximately 80 gallons from what might be expected based on that amount of flying time. After its return the plane, which was almost new when McLemore rented it, had constant problems with rust sediment in the fuel strainer, which Christensen considered indicative of Mexican flying.

On April 21, 1976, McLemore rented a plane from Christensen that had a cruising speed of approximately 190 miles per hour, and a cargo capacity of 850 pounds, stating that he was going to Denver. Upon his return on April 27, the plane's gauge showed 19.8 hours of use. Gas receipts (all from New Mexico) turned in this time totalled only 90.3 gallons, whereas the plane would normally use 14 to 16 gallons per hour. When asked about this, McLemore explained that he had forgotten to pick up some receipts and had lost others.

Christensen had called Agent Zablocki of the U.S. Drug Enforcement Administration when first contacted by McLemore about a Mexican trip. Apparently this was done to check if McLemore had a police record (he did not), as a precaution against a possible theft of a valuable plane, or loss because of seizure or wreck in Mexico. After this second trip the gas receipt shortages, sediment problems, discrepancies between receipts and apparent travel mileage, plus the fact that individuals do not usually rent such large and expensive planes for personal transportation, all combined to arouse Christensen's suspicions and he again contacted Agent Zablocki. Personnel at Christensen's business had previously given relia-

ble information to the authorities on an illicit drug operation which had used planes rented from him.

Agent Zablocki came to the airport to inspect the plane hired for the second trip, which had been flown on a short trip by its businessman-owner immediately after McLemore had returned. Zablocki discovered small amounts of leafy plant material and some marijuana seeds in the compartment behind the pilot's seat.

Zablocki had also checked out the Mike & Mike Tool & Die Company which McLemore had listed on his rental application as the business in which he was a partner. It was not listed in the telephone book, city directory or crisscross directory. The address given was a residence as opposed to a commercial building, and the telephone number given was that of McLemore's girl friend.

On the following May 4 Christensen informed Zablocki that McLemore called to rent another plane to fly to Wichita. Christensen was asked to stall to detain him until Zablocki could reach the airport. On that day there were two or three calls between Christensen and Zablocki when McLemore postponed his take-off time. This was passed on to the federal agent, but there is uncertainty as to when, exactly, Christensen informed the agent that McLemore had stated to Christensen that he was going to fly approximately 150 pounds of tools to Wichita. When McLemore arrived at the airport he was accompanied by defendant appellant Robert Michael Sugg. They appeared nervous to Christensen; they refused his offer to help them load the plane.

Zablocki and another agent arrived at the airport while the defendants were inside. Christensen came out and identified to the agents a station wagon as the vehicle which defendants drove to the airport. Through the windows of the station wagon, both agents observed what they believed to be the imprint of a brick of marijuana through a newspaper covering on one of several boxes which were visible. The agents had years of experience as narcotics officers, and with other officers, testified that pressed marijuana almost always was in kilogram bricks of a distinctive shape approximately three by five by ten inches, and that this imprint was of that shape.

A short time later McLemore and Sugg drove the station wagon around to the plane and began loading the items from the car into the plane. Both agents approached the plane. Agent Zablocki drew his revolver and ordered McLemore to put down the box and place his hands against the airplane. He patted down McLemore for weapons, found none, bent down, looked into the luggage compartment, smelled the odor of marijuana coming from the compartment. He then asked McLemore about the contents of the box on the ground. McLemore said he did not know. Zablocki bent down, smelled the top of the box and detected the odor of marijuana. He then felt the configuration of the kilo bricks used and at that point announced McLemore was under arrest. Observing that Zablocki had arrested McLemore, Agent Shannon then arrested Sugg. There followed a search of the boxes being loaded onto the plane, and more than 150 pounds of marijuana was found.

The Government contends that the agent's action in ordering McLemore at gunpoint to put down his box and put his hands against the plane was merely an investigatory detention within the meaning of *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) and *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry* the Supreme Court recognized that an officer could make a limited protective search for concealed weapons when the officer is justified in believing that the individual whose suspicious behavior he is investigating might be armed and dangerous to the officer. In *Adams* the officer's action in conducting a limited protective search was based on a reliable informant's tip that an individual in a parked car had a gun at his waist. In both of these cases the arrest which followed the discovery of the weapons was based upon the weapon discovered in the "frisk". The search which followed the lawful arrest, which turned up evidence

supporting another charge was ruled to be lawful as incident to a proper arrest.

These cases differ from the instant situation because here Agent Zablocki had no information from Christensen or others that either McLemore or Sugg were armed. The criminal activity they were suspected of was not a type as armed robbery would be, that would reasonably support an inference they were armed so as to present a danger to an interrogator. It is almost an irresistible inference that the frisk procedure here was not to protect the officer, but to place him in a position for a closer look at and smell of the boxes being loaded on the plane.

No formal words are necessary to complete an arrest, where the individual is given an order and his liberty of movement restricted. It seems clear that Agent Zablocki made the arrest when with gun drawn he ordered McLemore to put down the box and move over to place his hands against the body of the plane.

*Moran v. United States,* 404 F.2d 663 (10th Cir. 1968) is factually close. There this Court held that the arrest was complete as soon as an F.B.I. agent entered a motel room and ordered the individual "not to move" and to "get up against the wall." This was in spite of the fact that the agent then asked the person for identification and it was not until after he had examined it that the individual was handcuffed.

Officers may make a search incident to a lawful arrest, of course, and evidence obtained thereby is admissible. An arrest without a warrant must be made upon "probable cause." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) says probable cause rests upon:

Whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

The evidence tending to show a crime known to the officers at the time of the arrest has been recited above. For each separate item there is a possible explanation consistent with innocence. It is not a crime to fly to Mexico. One renting a plane to go from Tulsa to Denver may travel 3,000 or more miles, nor is he bound to go to the destination put on the lease form. Marijuana in the rented plane could be residue from other users. A lessee does not have to claim credit for gas purchases he makes on a trip. There are many things other than kilogram bricks of marijuana which could put an imprint on a newspaper similar to that involved here. A tool and die company can be run from a residence.

But we are concerned with the totality of the evidence in the context reasonably appearing to the officers responsible for investigation and arrest. The judgment of the experienced agents, under the circumstances, and that of Christensen, too, is entitled to some weight. The evidence to support a lawful arrest is not the same as that necessary to support a conviction.

As the Supreme Court stated in *Brinegar v. the United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949):

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . .

An inference is presented by the defendant-appellants that the officers should have procured a search warrant before going to the airport. The agent's testimony was that since apparently nothing had been unloaded upon the return from the earlier plane flights, he thought the marijuana was stored at some rural place, and this plane was going to pick it up enroute. He intended to try to track the defendants and had alerted federal drug agents in Wichita and elsewhere to watch for the arrival of the plane. Thus, until they saw the boxes Zablocki did not contemplate an arrest and search.

We hold that the agents acted within the law when they chose to make the arrest

rather than to risk the loss of the evidence they reasonably believed was being loaded onto the aircraft. The seized material was within the immediate control of the two defendant-appellants and hence properly admitted into evidence.

AFFIRMED.