# ADAMS, WARDEN *v.* WILLIAMS

No. 70–283. Argued April 10, 1972—Decided June 12, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 149. BRENNAN, J., filed a dissenting opinion, *post,* p. 151. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post,* p. 153.

*Donald A. Browne* argued the cause and filed briefs for petitioner.

*Edward F. Hennessey* argued the cause and filed a brief for respondent.

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Petersen,* and *Beatrice Rosenberg* for the United States; by *Frank S. Hogan, pro se, Michael R. Juviler,* and *Herman Kaufman* for the District Attorney of New York County; and by *Frank G. Carrington, Jr., Alan S. Ganz, Wayne W. Schmidt,* and *Glen R. Murphy* for Americans for Effective Law Enforcement, Inc., et al.

*Burt Neuborne* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Robert Williams was convicted in a Connecticut state court of illegal possession of a handgun found during a "stop and frisk," as well as of possession of heroin that was found during a full search incident to his weapons arrest. After respondent's conviction was affirmed by the Supreme Court of Connecticut, 157 Conn. 114, 249 A. 2d 245 (1968), this Court denied certiorari. 395 U. S. 927 (1969). Williams' petition for federal habeas corpus relief was denied by the District Court and by a divided panel of the Second Circuit, 436 F. 2d 30 (1970), but on rehearing *en banc* the Court of Appeals granted relief. 441 F. 2d 394 (1971). That court held that evidence introduced at Williams' trial had been obtained by an unlawful search of his person and car, and thus the state court judgments of conviction should be set aside. Since we conclude that the policeman's actions here conformed to the standards this Court laid down in *Terry* v. *Ohio,* 392 U. S. 1 (1968), we reverse.

Police Sgt. John Connolly was alone early in the morning on car patrol duty in a high-crime area of Bridgeport, Connecticut. At approximately 2:15 a.m. a person known to Sgt. Connolly approached his cruiser

and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist.

After calling for assistance on his car radio, Sgt. Connolly approached the vehicle to investigate the informant's report. Connolly tapped on the car window and asked the occupant, Robert Williams, to open the door. When Williams rolled down the window instead, the sergeant reached into the car and removed a fully loaded revolver from Williams' waistband. The gun had not been visible to Connolly from outside the car, but it was in precisely the place indicated by the informant. Williams was then arrested by Connolly for unlawful possession of the pistol. A search incident to that arrest was conducted after other officers arrived. They found substantial quantities of heroin on Williams' person and in the car, and they found a machete and a second revolver hidden in the automobile.

Respondent contends that the initial seizure of his pistol, upon which rested the later search and seizure of other weapons and narcotics, was not justified by the informant's tip to Sgt. Connolly. He claims that absent a more reliable informant, or some corroboration of the tip, the policeman's actions were unreasonable under the standards set forth in *Terry* v. *Ohio, supra.*

In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.,* at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

See *id.*, at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Id.*, at 21–22; see *Gaines* v. *Craven*, 448 F. 2d 1236 (CA9 1971); *United States* v. *Unverzagt*, 424 F. 2d 396 (CA8 1970).

The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he may conduct a limited protective search for concealed weapons. 392 U. S., at 24. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop,[1] and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. *Id.*, at 30.

Applying these principles to the present case, we believe that Sgt. Connolly acted justifiably in responding to his informant's tip. The informant was known to him personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip. The informant here came forward personally to give information that was immediately verifiable at the scene. Indeed, under

---

[1] Petitioner does not contend that Williams acted voluntarily in rolling down the window of his car.

Connecticut law, the informant might have been sub-
ject to immediate arrest for making a false com-
plaint had Sgt. Connolly's investigation proved the tip
incorrect.[2]  Thus, while the Court's decisions indicate
that this informant's unverified tip may have been in-
sufficient for a narcotics arrest or search warrant, see,
,e. g., *Spinelli* v. *United States,* 393 U. S. 410 (1969);
*Aguilar* v. *Texas,* 378 U. S. 108 (1964), the information
carried enough indicia of reliability to justify the officer's
forcible stop of Williams.

In reaching this conclusion, we reject respondent's
argument that reasonable cause for a stop and frisk
can only be based on the officer's personal observation,
rather than on information supplied by another person.
Informants' tips, like all other clues and evidence com-
ing to a policeman on the scene, may vary greatly in
their value and reliability.  One simple rule will not
cover every situation.  Some tips, completely lacking
in indicia of reliability, would either warrant no police
response or require further investigation before a forc-
ible stop of a suspect would be authorized.  But in
some situations—for example, when the victim of a
street crime seeks immediate police aid and gives a
description of his assailant, or when a credible informant
warns of a specific impending crime—the subtleties of the
hearsay rule should not thwart an appropriate police
response.

While properly investigating the activity of a person
who was reported to be carrying narcotics and a con-
cealed weapon and who was sitting alone in a car in a
high-crime area at 2:15 in the morning, Sgt. Connolly

---

[2] Section 53–168 of the Connecticut General Statutes, in force at
the time of these events, provided that a "person who knowingly
makes to any police officer . . . a false report or a false complaint
alleging that a crime or crimes have been committed" is guilty of
a misdemeanor.

had ample reason to fear for his safety.[3]   When Williams rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen, the revolver allegedly at Williams' waist became an even greater threat.   Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.   The loaded gun seized as a result of this intrusion was therefore admissible at Williams' trial.   *Terry* v. *Ohio,* 392 U. S., at 30.

Once Sgt. Connolly had found the gun precisely where the informant had predicted, probable cause existed to arrest Williams for unlawful possession of the weapon. Probable cause to arrest depends "upon whether, at the moment the arrest was made . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck* v. *Ohio,* 379 U. S. 89, 91 (1964). In the present case the policeman found Williams in possession of a gun in precisely the place predicted by the informant.   This tended to corroborate the reliability of the informant's further report of narcotics and, together with the surrounding circumstances, certainly suggested no lawful explanation for possession of the

---

[3] Figures reported by the Federal Bureau of Investigation indicate that 125 policemen were murdered in 1971, with all but five of them having been killed by gunshot wounds. Federal Bureau of Investigation Law Enforcement Bulletin, Feb. 1972, p. 33. According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963).

gun. Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. See *Draper* v. *United States,* 358 U. S. 307, 311–312 (1959). Rather, the court will evaluate generally the circumstances at the time of the arrest to decide if the officer had probable cause for his action:

> "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States,* 338 U. S. 160, 175 (1949).

See also *id.,* at 177. Under the circumstances surrounding Williams' possession of the gun seized by Sgt. Connolly, the arrest on the weapons charge was supported by probable cause, and the search of his person and of the car incident to that arrest was lawful. See *Brinegar* v. *United States, supra; Carroll* v. *United States,* 267 U. S. 132 (1925). The fruits of the search were therefore properly admitted at Williams' trial, and the Court of Appeals erred in reaching a contrary conclusion.

*Reversed.*

Mr. Justice Douglas, with whom Mr. Justice Marshall concurs, dissenting.

My views have been stated in substance by Judge Friendly, dissenting, in the Court of Appeals. 436 F. 2d 30, 35. Connecticut allows its citizens to carry weapons, concealed or otherwise, at will, provided they have a permit. Conn. Gen. Stat. Rev. §§ 29–35, 29–38. Connecticut law gives its police no authority to frisk a person for a permit. Yet the arrest was for illegal possession of a gun. The only basis for that arrest was the informer's

tip on the narcotics. Can it be said that a man in possession of narcotics will not have a permit for his gun? Is that why the arrest for possession of a gun in the free-and-easy State of Connecticut becomes constitutional?

The police problem is an acute one not because of the Fourth Amendment, but because of the ease with which anyone can acquire a pistol. A powerful lobby dins into the ears of our citizenry that these gun purchases are constitutional rights protected by the Second Amendment, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

There is under our decisions no reason why stiff state laws governing the purchase and possession of pistols may not be enacted. There is no reason why pistols may not be barred from anyone with a police record. There is no reason why a State may not require a purchaser of a pistol to pass a psychiatric test. There is no reason why all pistols should not be barred to everyone except the police.

The leading case is *United States* v. *Miller,* 307 U. S. 174, upholding a federal law making criminal the shipment in interstate commerce of a sawed-off shotgun. The law was upheld, there being no evidence that a sawed-off shotgun had "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Id.,* at 178. The Second Amendment, it was held, "must be interpreted and applied" with the view of maintaining a "militia."

> "The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be

secured through the Militia—civilians primarily, soldiers on occasion." *Id.*, at 178–179.

Critics say that proposals like this water down the Second Amendment. Our decisions belie that argument, for the Second Amendment, as noted, was designed to keep alive the militia. But if watering-down is the mood of the day, I would prefer to water down the Second rather than the Fourth Amendment. I share with Judge Friendly a concern that the easy extension of *Terry* v. *Ohio,* 392 U. S. 1, to "possessory offenses" is a serious intrusion on Fourth Amendment safeguards. "If it is to be extended to the latter at all, this should be only where observation by the officer himself or well authenticated information shows 'that criminal activity may be afoot.' " 436 F. 2d, at 39, quoting *Terry* v. *Ohio, supra,* at 30.

Mr. Justice Brennan, dissenting.

The crucial question on which this case turns, as the Court concedes, is whether, there being no contention that Williams acted voluntarily in rolling down the window of his car, the State had shown sufficient cause to justify Sgt. Connolly's "forcible" stop. I would affirm, believing, for the following reasons stated by Judge, now Chief Judge, Friendly, dissenting, 436 F. 2d 30, 38–39, that the State did not make that showing:

> "To begin, I have the gravest hesitancy in extending [*Terry* v. *Ohio,* 392 U. S. 1 (1968)] to crimes like the possession of narcotics . . . . There is too much danger that, instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true. Against that we have here the added fact of the report 'that Williams had a gun on his person. . . . [But] Connecticut allows its citizens to carry weapons, concealed or

otherwise, at will, provided only they have a permit, Conn. Gen. Stat. §§ 29–35 and 29–38, and gives its police officers no special authority to stop for the purpose of determining whether the citizen has one. . . .

"If I am wrong in thinking that *Terry* should not be applied at all to mere possessory offenses, . . . I would not find the combination of Officer Connolly's almost meaningless observation and the tip in this case to be sufficient justification for the intrusion. The tip suffered from a threefold defect, with each fold compounding the others. The informer was unnamed, he was not shown to have been reliable with respect to guns or narcotics, and he gave no information which demonstrated personal knowledge or—what is worse—could not readily have been manufactured by the officer after the event. To my mind, it has not been sufficiently recognized that the difference between this sort of tip and the accurate prediction of an unusual event is as important on the latter score as on the former. [In *Draper* v. *United States*, 358 U. S. 307 (1959),] Narcotics Agent Marsh would hardly have been at the Denver Station at the exact moment of the arrival of the train Draper had taken from Chicago unless *someone* had told him *something* important, although the agent might later have embroidered the details to fit the observed facts. . . . There is no such guarantee of a patrolling officer's veracity when he testifies to a 'tip' from an unnamed informer saying no more than that the officer will find a gun and narcotics on a man across the street, as he later does. If the state wishes to rely on a tip of that nature to validate a stop and frisk, revelation of the name of the informer or demonstration that his name is unknown and could

not reasonably have been ascertained should be the price.

"Terry v. Ohio was intended to free a police officer from the rigidity of a rule that would prevent his doing anything to a man reasonably suspected of being about to commit or having just committed a crime of violence, no matter how grave the problem or impelling the need for swift action, unless the officer had what a court would later determine to be probable cause for arrest. It was meant for the serious cases of imminent danger or of harm recently perpetrated to persons or property, not the conventional ones of possessory offenses. If it is to be extended to the latter at all, this should be only where observation by the officer himself or well authenticated information shows 'that criminal activity may be afoot.' 392 U. S., at 30. . . . I greatly fear that if the [contrary view] should be followed, *Terry* will have opened the sluicegates for serious and unintended erosion of the protection of the Fourth Amendment."

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Four years have passed since we decided *Terry* v. *Ohio*, 392 U. S. 1 (1968), and its companion cases, *Sibron* v. *New York* and *Peters* v. *New York*, 392 U. S. 40 (1968). They were the first cases in which this Court explicitly recognized the concept of "stop and frisk" and squarely held that police officers may, under appropriate circumstances, stop and frisk persons suspected of criminal activity even though there is less than probable cause for an arrest. This case marks our first opportunity to give some flesh to the bones of *Terry*

*et al.*  Unfortunately, the flesh provided by today's decision cannot possibly be made to fit on *Terry*'s skeletal framework.

"[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'  The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'  '[T]he burden is on those seeking the exemption to show the need for it.' " *Coolidge* v. *New Hampshire,* 403 U. S. 443, 454–455 (1971).  In *Terry* we said that "we do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure."  392 U. S., at 20.  Yet, we upheld the stop and frisk in *Terry* because we recognized that the realities of on-the-street law enforcement require an officer to act at times on the basis of strong evidence, short of probable cause, that criminal activity is taking place and that the criminal is armed and dangerous.  Hence, *Terry* stands only for the proposition that police officers have a "narrowly drawn authority to . . . search for weapons" without a warrant.  *Id.,* at 27.

In today's decision the Court ignores the fact that *Terry* begrudgingly accepted the necessity for creating an exception from the warrant requirement of the Fourth Amendment and treats this case as if warrantless searches were the rule rather than the "narrowly drawn" exception.  This decision betrays the careful balance that *Terry* sought to strike between a citizen's right to privacy and his government's responsibility for effective law enforcement and expands the concept of warrantless

searches far beyond anything heretofore recognized as legitimate. I dissent.

# I

A. The Court's opinion states the facts and I repeat only those that appear to me to be relevant to the Fourth Amendment issues presented.

Respondent was sitting on the passenger side of the front seat of a car parked on the street in a "high crime area" in Bridgeport, Connecticut, at 2:15 a. m. when a police officer approached his car. During a conversation that had just taken place nearby, the officer was told by an informant that respondent had narcotics on his person and that he had a gun in his waistband. The officer saw that the motor was not running, that respondent was seated peacefully in the car, and that there was no indication that he was about to leave the scene. After the officer asked respondent to open the door, respondent rolled down his window instead and the officer reached into the car and pulled a gun from respondent's waistband. The officer immediately placed respondent under arrest for carrying the weapon and searched him, finding heroin in his coat. More heroin was found in a later search of the automobile. Respondent moved to suppress both the gun and the heroin prior to trial. His motion was denied and he was convicted of possessing both items.

B. The Court erroneously attempts to describe the search for the gun as a protective search incident to a reasonable investigatory stop. But, as in *Terry, Sibron* and *Peters, supra,* there is no occasion in this case to determine whether or not police officers have a right to seize and to restrain a citizen in order to interrogate him. The facts are clear that the officer intended to make the search as soon as he approached the respondent. He asked no questions; he made no investigation; he simply searched.

There was nothing apart from the information supplied by the informant to cause the officer to search. Our inquiry must focus, therefore, as it did in *Terry* on whether the officer had sufficient facts from which he could reasonably infer that respondent was not only engaging in illegal activity, but also that he was armed and dangerous. The focus falls on the informant.

The only information that the informant had previously given the officer involved homosexual conduct in the local railroad station. The following colloquy took place between respondent's counsel and the officer at the hearing on respondent's motion to suppress the evidence that had been seized from him.

"Q. Now, with respect to the information that was given you about homosexuals in the Bridgeport Police Station [*sic*], did that lead to an arrest? A. No.

"Q. An arrest was not made. A. No. There was no substantiating evidence.

.     .     .     .     .

"Q. There was no substantiating evidence? – A. No.

"Q. And what do you mean by that? A. I didn't have occasion to witness these individuals committing any crime of any nature.

"Q. In other words, after this person gave you the information, you checked for corroboration before you made an arrest. Is that right? A. Well, I checked to determine the possibility of homosexual activity.

"Q. And since an arrest was made, I take it you didn't find any substantiating information. A. I'm sorry counselor, you say since an arrest was made.

"Q. Was not made. Since an arrest was not made, I presume you didn't find any substantiating information. A. No.

"Q. So that, you don't recall any other specific. information given you about the commission of crimes by this informant. A. No.

"Q. And you still thought this person was reliable. A. Yes." [1]

Were we asked to determine whether the information supplied by the informant was sufficient to provide probable cause for an arrest and search, rather than a stop and frisk, there can be no doubt that we would hold that it was insufficient. This Court has squarely held that a search and seizure cannot be justified on the basis of conclusory allegations of an unnamed informant who is allegedly credible. *Aguilar* v. *Texas,* 378 U. S. 108 (1964). In the recent case of *Spinelli* v. *United States,* 393 U. S. 410 (1969), Mr. Justice Harlan made it plain beyond any doubt that where police rely on an informant to make a search and seizure, they must know that the informant is generally trustworthy and that he has obtained his information in a reliable way. *Id.,* at 417. Since the testimony of the arresting officer in the instant case patently fails to demonstrate that the informant was known to be trustworthy and since it is also clear that the officer had no idea of the source of the informant's "knowledge," a search and seizure would have been illegal.

Assuming, *arguendo,* that this case truly involves, not an arrest and a search incident thereto, but a stop and frisk,[2] we must decide whether or not the information possessed by the officer justified this interference with respondent's liberty. *Terry,* our only case to actually

---

[1] App, 96–97.

[2] *Terry* v. *Ohio,* 392 U. S. 1 (1968), makes it clear that a stop and frisk is a search and seizure within the meaning of the Fourth Amendment. When I use the term stop and frisk herein, I merely intend to emphasize that it is, as *Terry* held, a lesser intrusion than a full-scale search and seizure.

uphold a stop and frisk,[3] is not directly in point, because the police officer in that case acted on the basis of his own personal observations. No informant was involved. But the rationale of *Terry* is still controlling, and it requires that we condemn the conduct of the police officer in encountering the respondent.

*Terry* did not hold that whenever a policeman has a hunch that a citizen is engaging in criminal activity, he may engage in a stop and frisk. It held that if police officers want to stop and frisk, they must have specific facts from which they can reasonably infer that an individual is engaged in criminal activity and is armed and dangerous.[4] It was central to our decision in *Terry* that the police officer acted on the basis of his own personal observations and that he carefully scrutinized the conduct of his suspects before interfering with them in any way. When we legitimated the conduct of the officer in *Terry* we did so because of the substantial *reliability* of the information on which the officer based his decision to act.

If the Court does not ignore the care with which we examined the knowledge possessed by the officer in *Terry* when he acted, then I cannot see how the actions of the officer in this case can be upheld. The Court explains what the officer knew about respondent before accosting him. But what is more significant is what he did not know. With respect to the scene generally, the officer had no idea how long respondent had been in the car, how long the car had been parked, or to whom the car belonged. With respect to the gun,[5] the officer did not

---

[3] In *Sibron* v. *New York*, 392 U. S. 40 (1968), the Court held that the action of the policeman could not be justified as a stop and frisk. In *Peters* v. *New York*, 392 U. S. 40 (1968), the Court sustained the validity of a search and seizure by holding that it was incident to a legal arrest.

[4] *Terry* v. *Ohio,* 392 U. S., at 29; *Sibron* v. *New York,* 392 U. S., at 64.

[5] The fact that the respondent carried his gun in a high-crime area

know if or when the informant had ever seen the gun, or whether the gun was carried legally, as Connecticut law permitted, or illegally.[6] And with respect to the narcotics, the officer did not know what kind of narcotics respondent allegedly had, whether they were legally or illegally possessed, what the basis of the informant's knowledge was, or even whether the informant was capable of distinguishing narcotics from other substances.[7]

Unable to answer any of these questions, the officer nevertheless determined that it was necessary to intrude on respondent's liberty. I believe that his determination was totally unreasonable. As I read *Terry*, an officer may act on the basis of *reliable* information short of probable cause to make a stop, and ultimately a frisk, if necessary; but the officer may not use unreliable, unsubstantiated, conclusory hearsay to justify an invasion of liberty. *Terry* never meant to approve the kind of knee-jerk police reaction that we have before us in this case.

Even assuming that the officer had some legitimate reason for relying on the informant, *Terry* requires, before any stop and frisk is made, that the reliable information in the officer's possession demonstrate that the suspect is both armed and *dangerous*.[8] The fact remains that

is irrelevant. In such areas it is more probable than not that citizens would be more likely to carry weapons authorized by the State to protect themselves.

[6] See Conn. Gen. Stat. Rev. § 29–35.

[7] Connecticut permits possession of certain narcotics under specified circumstances—*e. g.*, pursuant to a doctor's prescription. See Conn. Gen. Stat. Rev. §§ 19–443, 19–456 (c). 19–481.

[8] The Court virtually ignores the requirement that the suspect be dangerous, as well as armed. Other courts have followed *Terry* more closely. See, *e. g., Commonwealth* v. *Bourke*, 218 Pa. Super. 320, 323, 280 A. 2d 425, 427 (1971); *Commonwealth* v. *Clarke*, 219 Pa. Super. 340, 343, 280 A. 2d 662, 663 (1971); *Finley* v. *People*, 176 Colo. 1, 488 P. 2d 883 (1971). See also *State* v. *Goudy*, 52 Haw. 497, 505, 479 P. 2d 800, 805 (1971) (Abe, J., dissenting).

Connecticut specifically authorizes persons to carry guns so long as they have a permit. Thus, there was no reason for the officer to infer from anything that the informant said that the respondent was dangerous. His frisk was, therefore, illegal under *Terry*.

## II

Even if I could agree with the Court that the stop and frisk in this case was proper, I could not go further and sustain the arrest and the subsequent searches. It takes probable cause to justify an arrest and search and seizure incident thereto. Probable cause means that the "facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been committed . . . ." *Stacey* v. *Emery,* 97 U. S. 642, 645 (1878). "[G]ood faith is not enough to constitute probable cause." *Director General* v. *Kastenbaum,* 263 U. S. 25, 28 (1923).

Once the officer seized the gun from respondent, it is uncontradicted that he did not ask whether respondent had a license to carry it, or whether respondent carried it for any other legal reason under Connecticut law. Rather, the officer placed him under arrest immediately and hastened to search his person. Since Connecticut has not made it illegal for private citizens to carry guns, there is nothing in the facts of this case to warrant a man "of prudence and caution" to believe that any offense had been committed merely because respondent had a gun on his person.[9] Any implication that respondent's silence

---

[9] The Court appears to rely on the fact that the existence of the gun corroborated the information supplied to the officer by the informant. It cannot be disputed that there is minimal corroboration here, but the fact remains that the officer still lacked any knowledge that respondent had done anything illegal. Since carrying a gun is not *per se* illegal in Connecticut, the fact that respondent carried

was some sort of a tacit admission of guilt would be utterly absurd.

It is simply not reasonable to expect someone to protest that he is not acting illegally before he is told that he is suspected of criminal activity. It would have been a simple matter for the officer to ask whether respondent had a permit, but he chose not to do so. In making this choice, he clearly violated the Fourth Amendment.

This case marks a departure from the mainstream of our Fourth Amendment cases. In *Johnson* v. *United States,* 333 U. S. 10 (1948), for example, the arresting officer had an informant's tip and actually smelled opium coming from a room. This Court still found the arrest unlawful. And in *Spinelli* v. *United States,* 393 U. S. 410, we found that there was no probable cause even where an informant's information was corroborated by personal observation. If there was no probable cause in those cases, I find it impossible to understand how there can be probable cause in this case.

## III

MR. JUSTICE DOUGLAS was the sole dissenter in *Terry.* He warned of the "powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees . . . ." 392 U. S., at 39. While I took the position then that we were not watering down rights, but were hesitantly and cautiously striking a necessary balance between the rights of American citizens to be free from government intrusion into their

a gun is no more relevant to probable cause than the fact that his shirt may have been blue, or that he was wearing a jacket. Moreover, the fact that the informant can identify a gun on sight does not indicate an ability to do the same with narcotics. The corroboration of this one fact is a far cry from the corroboration that the Court found sufficient to sustain an arrest in *Draper* v. *United States,* 358 U. S. 307 (1959).

privacy and their government's urgent need for a narrow exception to the warrant requirement of the Fourth Amendment, today's decision demonstrates just how prescient MR. JUSTICE DOUGLAS was.

It seems that the delicate balance that *Terry* struck was simply too delicate, too susceptible to the "hydraulic pressures" of the day. As a result of today's decision, the balance struck in *Terry* is now heavily weighted in favor of the government. And the Fourth Amendment, which was included in the Bill of Rights to prevent the kind of arbitrary and oppressive police action involved herein, is dealt a serious blow. Today's decision invokes the specter of a society in which innocent citizens may be stopped, searched, and arrested at the whim of police officers who have only the slightest suspicion of improper conduct.