THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
GIULIO L. MORACA, Defendant-Appellee.

Second District   No. 83—568

Opinion filed May 25, 1984.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and
Raymond L. Beck, both of State's Attorneys Appellate Service Commission,
of counsel), for the People.

G. Joseph Weller and Nicholas J. Kritikos, both of State Appellate De-
fender's Office, of Elgin, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:
Defendant, Giulio L. Moraca, was charged by information in the
circuit court of Kane County with the offense of unlawful possession of
more than 30 grams but not more than 500 grams of a substance con-
taining cannabis, and by traffic complaint with the violations of driving

with a suspended driver's license and the illegal transportation of alcohol. After hearing testimony and argument on defendant's suppression motion, the trial court ruled on May 20, 1983, that the warrantless search of defendant's car violated the fourth amendment to the Federal Constitution. The State appeals the suppression order, arguing that the information conveyed by the informant's tip was sufficient to warrant a brief investigatory stop. Defendant responds that the tip was conclusory, uncorroborated and standing alone, did not justify the police action here. We affirm.

On February 25, 1983, at about 3 p.m., Detective Brictson of the Elgin police department received a phone call from one of the operators at an organization known as Catch A Thief With Citizen's Help (CATCH). According to Brictson, "The CATCH operator takes the call from anonymous sources and then relays that information to the police department, and if there's an arrest made sometimes the individuals who have given this information are paid for the information." In this case, Brictson spoke with the CATCH operator and not directly with the informant.

Brictson testified concerning the substance of the information conveyed to him by the CATCH operator.

"I was informed that a subject by the name of Guilio [*sic*] Moraca, who drives a blue van with Illinois license plates Young Zebra Charles 625 was in possession of a machine gun which he carried in a black pouch.

He was also allegedly in possession of cannabis, which he contained in a green bank-type bag. And that this Moraca subject frequented the area of Hickory Street in Elgin and was possibly either suspended or revoked in regards to his driver license status."

At approximately 6:20 p.m. Brictson and his partner, Detective Strickland, cruised the area of Hickory Street in Elgin and observed a blue van with license plate number YZC625 parked and unoccupied in a driveway. A license plate check indicated the van was registered to "All Seasons Home and Yard," a lawn care business.

After returning to the police station and enlisting the aid of uniformed Officer Barnes, they returned to Hickory Street and observed at 6:40 p.m. the van being driven away by a male white subject. Neither Brictson nor Strickland recognized the driver. The driver stopped once to drop off a passenger, and then was stopped by Barnes in a marked squad car. Both detectives saw nothing unusual or suspicious about the van at any time prior to the stop, and the sole basis for effecting the stop was the information supplied by CATCH. Defendant

was not pulled over as a result of any motor vehicle violation.

The driver of the van alighted from the driver's side, leaving the door open, and walked back toward Barnes. Brictson and Strickland had pulled up next to the van. One of the policemen, with his revolver drawn, ordered the van's driver up against the van, instructing him not to move, and Barnes frisked him.

Strickland and Brictson went to the van—Strickland from the passenger side and Brictson from the driver's side. Strickland, peering through the window, saw a beer can on the dash, but could not tell if it contained anything. He opened the door, reached in and felt the can which "was cold and had some beer in it." Brictson opened the black, zippered pouch which had been partially protruding from underneath the driver's seat and observed what appeared to be a machine pistol.

Up to this point, no one had asked the driver for his name or identification and the officers did not ask nor did defendant grant his permission to go inside the van. Brictson asked the driver for his name and date of birth, learning that he was Moraca, the defendant. Brictson ran a driver's license check through the communications center and learned that Moraca's driver's license was presently suspended.

Defendant was handcuffed and escorted by Brictson and Barnes to the paddy wagon which had arrived to transport him. Before placing defendant in the wagon, Brictson conducted a second search of his person, whereupon a green bank bag fell from defendant's coat to the pavement. Brictson opened the bag and observed a quantity of what he suspected was cannabis inside. From the trial court's order finding this stop violative of defendant's fourth amendment rights, the State brings this interlocutory appeal.

■■ The State argues that the stop was justified as a result of the rule announced in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, where the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." (392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880.) In *Terry*, the court authorized a brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information. (392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1880.) Specific and articulable facts and not a hunch must exist to justify a *Terry* stop. Where the officer justifiably believes that the suspicious individual is armed and is presently dangerous, the officer may conduct a limited protective search for concealed weapons. (392 U.S. 1, 24, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1881.) Though

*Terry* involved the stopping of a pedestrian, the same test is applicable to the stopping of a vehicle. See 3 W. LaFave, Search & Seizure sec. 9.3, at 33 (1984 Supp.), citing *Mosley v. State* (1981), 289 Md. 571, 425 A.2d 1039.

■ A reviewing court will not reverse the trial court's finding on a motion to suppress unless the finding is manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) The trial court here specifically found that the only basis for the stop was the information provided by the CATCH organization which was "conclusionary" and that "the information provided to the police did not provide any basis or set out any articulable facts upon which the police could have possibly formed any opinion as to the possible [*sic*] cause to make any stop of the defendant of of [*sic*] his vehicle under *Terry* or any other authority to stop and frisk." These findings should be reversed only if they are manifestly erroneous.

On appeal, the State concedes that the sole basis for its information regarding defendant was from the informant's tip relayed through CATCH. The State principally relies upon two decisions which it argues support reversal of the lower court. In *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921, a police officer was approached by an informant who told the officer that an individual seated in a nearby vehicle was carrying narcotics and had a gun tucked into his waist. The officer approached the car, tapped on the window and asked the defendant to open the door. Instead, the defendant opened the window and the officer reached into the car and removed the gun which was tucked into the defendant's waistband. The Supreme Court upheld the stop as conforming with *Terry* standards.

The State argues *Adams* is controlling because the Supreme Court found that the tip justified the stop even though the informant had never supplied any tips relating to narcotics and none of his information had resulted in an arrest. *Adams*, however, is distinguishable from the instant case in several important respects. While the court did reject the defendant's contention that a stop could only be based upon an officer's personal observations and not upon a tip, the court acknowledged that the officer in *Adams* in addition to the tip also stopped the defendant because he "was sitting alone in a car in a high-crime area at 2:15 in the morning." (407 U.S. 143, 147, 32 L. Ed. 2d 612, 618, 92 S. Ct. 1921, 1924.) In contrast to those suspicious circumstances, the officers in the instant case specifically testified that there was nothing unusual about the van or driver prior to the stop.

Another distinguishing factor is that the informer in *Adams* was known to the officer personally and had provided information in the

past. Furthermore, the officer testified that he believed the informant was reliable. The alleged criminal activity also distinguishes these two cases. The defendant in *Adams* was supposed to be carrying narcotics and a gun, both of which could easily be disposed of if the officer did not attempt to preserve the status quo. While this case also involved a gun and narcotics, the police were also interested in observing defendant operating the van, which could then form the basis for the motor vehicle violation of driving on a suspended license. For this offense, the officers did not need to stop the van without first obtaining additional specific articulable facts. For example, the police could have first determined that defendant's license was in fact suspended, could have obtained a description of defendant prior to making the stop, and could have attempted to determine the relationship between Moraca and the business which was the registered owner of the van.

Unlike the instant case, in *Adams* the informer spoke directly to the officer and the information was immediately verifiable at the scene. The *Adams* court expressly distinguished its facts from those involving an anonymous tip like the instant case.

> "This is a stronger case than obtains in the case of an anonymous telephone tip. The informant here came forward personally to give information that was immediately verifiable at the scene." (407 U.S. 143, 146, 32 L. Ed. 2d 612, 617, 92 S. Ct. 1921, 1923.)

The informant in *Adams* told the officer that the individual was currently carrying narcotics and had a gun at his waist. The tip relayed to the police here by CATCH only informed police that defendant was "in possession" of cannabis and a machine gun, but did not specify whether these items were even on his person or in the van. While Brictson testified that Strickland told him that the cannabis and gun were in the van, Strickland's description of the contents of the tip indicate only that the gun and cannabis were in Moraca's possession. For these reasons, we find *Adams* distinguishable from the case at bar.

The State also relies on *People v. Miller* (1975), 36 Ill. App. 3d 542, 345 N.E.2d 1, where the court upheld a *Terry* stop. In *Miller*, the informer advised the police that a stolen red International dump truck with a white painted grill was operating in a certain area and was leased to Southern Illinois Black Truckers, Inc., the defendant's company. Acting on this information, the officer stopped the truck and ran a vehicle identification check which indicated the truck was not stolen. A subsequent stop, however, uncovered evidence that the truck was stolen. In challenging the initial stop, the defendant argued that the State failed to substantiate how the informer reached his conclusions

and that the tip alone was insufficient to stop the truck. In a supplemental opinion on a denial of rehearing, the *Miller* court held that the officer had effected a valid *Terry* stop. The *Miller* court noted that the officer had known the informant for two or three years prior to the tip. This fact distinguishes *Miller* from the instant case, where not only was the informant not known to the officer, but the informant did not even speak directly with him concerning the tip. Also, the informant in *Miller* told the police that the truck was stolen. Therefore, the identity of the driver was not critical. Here, in contrast, the informant told police that a person named Moraca was driving on a suspended license. Ascertainment of defendant's description was essential, therefore, before the police could entertain a reasonable suspicion that a crime was being committed. Likewise, the trial court could have found that the tip here was deficient in not providing the officers with a reasonable basis for suspecting that the contraband was in the van. We believe *Miller* does not support the State's position that the trial court's order here was manifestly erroneous.

Another infirmity is that the informant here never spoke to the police officers directly and thus, they had no basis for determining the informant's knowledge or reliability. Recently, the Supreme Court in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, considered an informant's tip in a slightly different context. There, a letter was sent by an unidentified informant to the Bloomingdale police department stating the defendants were drug dealers and predicting they would travel to Florida and return with drugs in their car. Specifically, the letter accused the Gates by name of making their living selling drugs, stated the location of their residence, and described their routine for drug purchases. The informant also predicted the wife would drive to Florida on May 3, and that the husband would subsequently fly to Florida and drive the car back to Illinois with the drugs in the trunk.

The Supreme Court agreed with the conclusion of the Illinois Supreme Court that the anonymous letter standing alone was insufficient to support a probable cause finding. As the Supreme Court stated, "The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gates' criminal activities." (*Illinois v. Gates* (1983), 426 U.S. 213, 227, 76 L. Ed. 2d 527, 541, 103 S. Ct. 21317, 2326.) While *Gates* analyzed the sufficiency of the information conveyed by the informer in relation to a probable cause determination as opposed to the stop-and-frisk issue presented here, the infirmities noted above

are relevant to the tip here. Nothing in the phone call relayed to the police by CATCH in the case at bar demonstrates that the informant is honest or reliable or indicates any basis for his knowledge of defendant's illegal activities.

*Gates*, like the instant case, also involved facts which corroborated the information provided by the informant. In *Gates*, the detective provided an affidavit with the following corroborative facts. An investigation subsequent to the receipt of the letter confirmed that Lance Gates of Bloomingdale had been issued a driver's license and that an "L. Gates" had made an airline reservation for Florida on May 5. Lance Gates was observed boarding the flight in Chicago, deplaning in Palm Beach, Florida, and later staying overnight with a woman in a room registered to Susan Gates. The next day, the couple was observed driving north on a road commonly used by persons traveling to Chicago. The license plate number on the car was registered to another car which was owned by Gates.

The Supreme Court applying a new "totality of the circumstances" test held that this affidavit which confirmed "major portions of the letter's predictions" together with the letter provided the judge issuing the warrant with a sufficient basis for concluding that probable cause existed to search the Gates' home and car. (*Illinois v. Gates* (1983), 462 U.S. 213, 246, 76 L. Ed. 2d 527, 553, 103 S. Ct. 2317, 2336.) In contrast, the only corroborating events here which occurred prior to the stop were that the police located a blue van in the vicinity of Hickory Street with a specified license plate number.

The State argues that the existence of the black and green bag found by the officers constitutes further corroborative evidence of the informant's tip. However, this argument amounts to an attempt to bootstrap the subsequent discovery of the drugs and weapon to justify the initial stop. Only corroborative facts known to the officer prior to the stop should justify a *Terry* stop.

■ Since we conclude that the trial court's order was not manifestly erroneous, we need not reach the question whether the subsequent searches violated defendant's fourth amendment rights.

The order of the circuit court of Kane County is affirmed.

Affirmed.

SEIDENFELD, P.J., and UNVERZAGT, J., concur.