THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SAMUEL YARBER, Defendant-Appellee.

Fifth District   No. 5—95—0143

Opinion filed April 16, 1996.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE KUEHN delivered the opinion of the court:

On Wednesday, November 9, 1994, at approximately 9:15 p.m., defendant Samuel Yarber (Yarber) arrived in Carbondale, Illinois, on an Amtrak train. He exited the train and began walking towards the station parking lot. As he was walking, he was approached by Carbondale police officer Dee Cross, who called Yarber by name. Officer Cross asked Yarber for identification. Yarber produced his driver's license and Southern Illinois University identification card. Officer Cross informed Yarber that she had reason to suspect that he possessed drugs. She asked Yarber if he had drugs. Yarber responded negatively. Officer Cross then requested consent to search Yarber's two bags and his person. Whether or not Yarber consented to a search of his person is disputed. Officer Cross conducted a limited search of Yarber's person, which yielded nothing. Yarber denied consent to search his two bags.

Officer Cross consulted with the four other officers in attendance regarding what to do in light of Yarber's refusal to consent. The police officers decided to have a dog trained in narcotics detection brought to the Amtrak station to sniff Yarber's bags. Prior to their arrival at the station, the officers were aware that the Carbondale police department narcotics dog, Jasper, could not be brought to the station because he lacked liability insurance for work in public places. The police officers contacted the Illinois State Police to determine if its dog was available. The Illinois State Police narcotics dog was unavailable. A call to Williamson County to check on the availability of its dog was similarly unsuccessful.

While the police officers made these calls, Yarber stood next to his luggage. The police officers claimed that they advised Yarber he was free to leave and that he chose to remain with the officers. Yarber claims that he was never so advised.

Finally, the police officers decided to seize Yarber's two bags and transport them to the Carbondale police department headquarters, where Jasper could conduct his sniff test. Yarber was advised that if he accompanied the officers to police headquarters, a receipt for his bags would be provided.

The length of detention from police contact as Yarber exited the train until the bags were seized was also in dispute. The parties agree that the detention lasted longer than 15 minutes. While Yarber was free to leave, he was not allowed to take his bags and was advised that if he attempted to do so, he would be arrested.

Later that evening at the Carbondale police department headquarters, Jasper sniffed and alerted on both of Yarber's bags. On the basis of an anonymous tip and the alert, a search warrant was

obtained for both bags. A search of the bags revealed that one contained approximately two pounds of cannabis. The other bag did not contain cannabis.[1]

Yarber was charged with unlawful possession of more than 500 grams of cannabis with intent to deliver, a Class 2 felony. 720 ILCS 550/5(e) (West 1992). Yarber filed a motion to suppress the cannabis and all testimony regarding the cannabis, claiming that the stop, detention, and seizure were illegal.

At the hearing, testimony focused upon information provided by the anonymous informant. On November 8, 1994, at approximately noon, an anonymous informant telephoned the Crimestoppers line, staffed by the Carbondale police department. The informant claimed that her best friends purchased cannabis on a regular basis from a man by the name of Samuel Yarber and that he sold cannabis at parties. The informant provided Yarber's general physical description (race, height, and weight), provided his dormitory address at Southern Illinois University, and indicated that he lived alone at that address and that he worked at the Lentz Hall cafeteria. Four hours later, the anonymous informant called back and indicated that Yarber would leave that date by Amtrak train bound for Chicago, Illinois, returning by Amtrak train to Carbondale on November 9, 1994. The purpose of this trip to Chicago was to purchase cannabis.

In an effort to confirm the details of the anonymous tips, the Carbondale police department contacted university law enforcement officials, who confirmed that Yarber was a Southern Illinois University

---

[1]Jasper's drug detection powers and method of alert were not the subject of serious challenge. Nor was any complaint registered concerning police interpretation of Jasper's alert behavior. Since Jasper's actions and the interpretation of those actions formed the basis for probable cause to issue search warrants for both of Yarber's bags and only one bag actually contained contraband, it is worthy to note the rather unique circumstances that accompany canine Jasper and his work.

Authorities explained at the suppression hearing that Jasper is a "nonaggressive" narcotics detection dog. When detecting the presence of illegal drugs, Jasper displays his scent of the contraband by "simply sitting down." When the first of Yarber's two bags was brought to a standing Jasper, he sniffed and he sat down. Thereafter, Jasper assumed a four-point stance to ready himself for a whiff of Yarber's second bag. The second bag was produced and, again, Jasper sat down. The officers who witnessed Jasper's performance, trained in his nonaggressive detection alert tactics, concluded that he alerted on both bags and secured warrants on that conclusion. Apparently, with regard to one of the bags, Jasper did not mean to convey a drug alert and was "simply sitting down."

student and resided alone at the address provided by the informant. A check with Yarber's employer revealed that he had not worked in the cafeteria for several days. A criminal background check was helpful in confirming Yarber's race, height, and weight.

University officials proceeded to the Amtrak station on November 8, 1994. The train bound for Chicago had already departed. Amtrak maintained no list of passengers, and so there was no way to confirm that Yarber was on board that train. An Amtrak employee, Nelson Miesner, when shown a Polaroid photograph of Yarber's college identification card photograph, indicated that he was "almost positive" that Yarber had been in the train station earlier that day, requesting change. University officials also checked the Amtrak reserved list for the November 9, 1994, train originating in Chicago, but Yarber was not on the list. Repeated telephone calls to a telephone number listed for Yarber went unanswered. An answering machine picked up on each occasion, identifying the absent occupant as "Frostbite."

Following a hearing, the trial court granted Yarber's motion to suppress. The State appeals. The State claims that the trial court erred in suppressing the evidence. We disagree and affirm the trial court.

■ The trial court found that the Carbondale police officers had a reasonable basis to stop Yarber, but that the officers inappropriately seized his bags. We agree with the trial court's order of suppression, but we do so for a different reason. On appeal, a reviewing court can sustain a decision of the trial court for any appropriate reason, regardless of whether the trial court relied on those grounds and regardless of whether the trial court's reasoning was correct. *People v. Novak*, 163 Ill. 2d 93, 101, 643 N.E.2d 762, 767 (1994).

■ With a motion to suppress evidence, the defendant bears the burden of proof to establish that the search and seizure were unreasonable. *People v. Neal*, 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899 (1985). A reviewing court will not reverse the trial court, unless the order of suppression is manifestly erroneous. *Neal*, 109 Ill. 2d at 218, 486 N.E.2d at 899.

■ The warrant clause of the fourth amendment provides that "no Warrants shall issue, but upon probable cause." U.S. Const., amend. IV. Accordingly, valid search warrants and arrest warrants may only issue upon a showing of probable cause. *United States v. Harris*, 403 U.S. 573, 584, 29 L. Ed. 2d 723, 734, 91 S. Ct. 2075, 2082 (1971) (search warrant); *Henry v. United States*, 361 U.S. 98, 102, 4 L. Ed. 2d 134, 138-39, 80 S. Ct. 168, 171 (1959) (arrest warrant).

The United States Supreme Court created a limited exception to

the fourth amendment probable cause requirement for seizures, in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In *Terry*, the court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880. *Terry* permitted a brief stop of a suspicious individual in order to ascertain his identity or to maintain the status quo while obtaining additional information. *Terry*, 392 U.S. at 21-22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880. The stop's purpose was to investigate the articulable suspicions of the officer that the person stopped had committed or was about to commit a crime. *Terry*, 392 U.S. at 21, 30, 20 L. Ed. 2d at 906, 911, 88 S. Ct. at 1880, 1884. With all *Terry* stops, the police officer's conduct must be reasonable under the circumstances known to the officer at the time he initiated the stop. *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883; *People v. Long*, 99 Ill. 2d 219, 229, 457 N.E.2d 1252, 1256 (1983). To be considered reasonable, a *Terry* stop must be based upon more substantial facts than a police officer's hunch. *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880; *People v. Smithers*, 83 Ill. 2d 430, 435-36, 415 N.E.2d 327, 331 (1980). To justify a temporary detention, the police officers must point to specific, articulable facts which, when considered with natural inferences, make the intrusion reasonable. *Smithers*, 83 Ill. 2d at 436, 415 N.E.2d at 331, citing *People v. McGowan*, 69 Ill. 2d 73, 78, 370 N.E.2d 537, 539 (1977).

In *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), the permissibility of *Terry* stops was extended, from stops based only upon a police officer's personal observation, to stops based upon an informant's tip. The Supreme Court stated that the informant's tip was stronger than an anonymous tip because the informant previously provided accurate information to the police. *Adams*, 407 U.S. at 147, 32 L. Ed. 2d at 617, 92 S. Ct. at 1924. The informant's tip conveyed sufficient "indicia of reliability" to justify the police officer's forcible stop. *Adams*, 407 U.S. at 147, 32 L. Ed. 2d at 617, 92 S. Ct. at 1924. The defendant's failure to comply with the police officer's request to step out of his car further justified the police officer's action. *Adams*, 407 U.S. at 148, 32 L. Ed. 2d at 618, 92 S. Ct. at 1924.

The United States Supreme Court addressed anonymous tips in a probable cause context in *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). An anonymous informant contacted the police by letter asserting that the Gateses, who resided in a Chicago suburb, were drug traffickers. *Gates*, 462 U.S. at 225, 76 L. Ed. 2d at

540, 103 S. Ct. at 2325. The letter further included the Gateses' drug trafficking routine. Mrs. Gates always drove a car to Florida, left the car in Florida, and flew back to Chicago. Mr. Gates always flew down to Florida and drove back in the same car with the drugs in the trunk. The informant also predicted the dates of the next drug run. Upon receipt of the letter, the police began to verify the details of the letter. The Secretary of State was able to confirm that Lance Gates had an Illinois driver's license. *Gates*, 462 U.S. at 225-26, 76 L. Ed. 2d at 540, 103 S. Ct. at 2325. An "L. Gates" made an airline reservation to Florida on a date consistent with information contained within the letter. *Gates*, 462 U.S. at 226, 76 L. Ed. 2d at 540, 103 S. Ct. at 2325-26. Lance Gates was observed boarding the flight in Chicago and de-planing in Palm Beach, Florida. *Gates*, 462 U.S. at 226, 76 L. Ed. 2d at 540, 103 S. Ct. at 2326. The police determined that Lance Gates spent the night at a hotel with a woman who registered as Susan Gates. The following day, the couple left the hotel and began driving in a northerly direction on a road commonly used by travelers heading to Chicago. The license plate of the vehicle occupied by Mr. Gates and the unidentified woman was registered to a vehicle owned by the Gateses. *Gates*, 462 U.S. at 226, 76 L. Ed. 2d at 540-41, 103 S. Ct. at 2326.

The Supreme Court concluded that the anonymous letter alone was insufficient to support a finding of probable cause. *Gates*, 462 U.S. at 227, 76 L. Ed. 2d at 541, 103 S. Ct. at 2326. By corroborating the details of the informant's tip, probable cause existed to issue the search warrant. *Gates*, 462 U.S. at 246, 76 L. Ed. 2d at 553, 103 S. Ct. at 2336.

■ In reaching this decision, the Court in *Gates* adopted a new totality of the circumstances approach to probable cause analysis in situations dealing with informants. *Gates*, 462 U.S. at 238, 76 L. Ed. 2d at 548, 103 S. Ct. at 2332. Prior to *Gates*, a two-pronged test was applied in determining the existence of probable cause with information provided by informants. *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). The first prong was the basis of the informant's knowledge that a certain person had been, was, or would be involved in criminal conduct or that evidence of a crime would be located at a certain place. *Aguilar*, 378 U.S. at 114, 12 L. Ed. 2d at 729, 84 S. Ct. at 1514. The second prong involved the veracity of the informant. *Aguilar*, 378 U.S. at 114-15, 12 L. Ed. 2d at 729, 84 S. Ct. at 1514. With the totality of the circumstances approach, a deficiency in one element can be made up by the strength of the other element. *Gates*, 462 U.S. at 233, 76 L. Ed. 2d at 545, 103 S. Ct. at 2329. Veracity, reliability, and basis of knowledge remain "highly relevant in

determining the value of [the informant's] report." *Gates*, 462 U.S. at 230, 76 L. Ed. 2d at 543, 103 S. Ct. at 2328.

Veracity, reliability, and basis of knowledge are also relevant in a *Terry* reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet this standard. *Alabama v. White*, 496 U.S. 325, 328-29, 110 L. Ed. 2d 301, 308, 110 S. Ct. 2412, 2415 (1990). In *White*, the Supreme Court confirmed that an anonymous tip can form the basis for a *Terry* stop, so long as the tip bears some indicia of reliability and/or other information establishes the "requisite quantum of suspicion." *White*, 496 U.S. at 329-30, 110 L. Ed. 2d at 308, 110 S. Ct. at 2416.

The police agency in *White* received an anonymous telephone tip that a woman named Vanessa White would leave a particular apartment on that date and get into a brown Plymouth station wagon with a broken right taillight in the apartment parking lot. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 306-07, 110 S. Ct. at 2414. The informant further indicated that Vanessa White would drive the Plymouth to a particular motel and that approximately one ounce of cocaine would be in a brown attaché case in her possession. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2414.

The police officers went to the apartment and observed the Plymouth in the parking lot. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2414. At some point, a woman emerged from the specified apartment and got into the Plymouth. The woman drove in the direction of the motel. Just short of the motel, the officers stopped the vehicle, advising the woman that they suspected she possessed cocaine. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2414-15. The officers obtained consent to search and found cannabis in the brown attaché case. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2415. The officers also found cocaine in her purse.

The Court stated that the Vanessa White anonymous tip provided virtually no information from which a police officer could conclude that the informant was honest or that his information was reliable, because the informant provided no indication of the basis for the informant's predictions about Vanessa White's criminal activities. *White*, 496 U.S. at 329, 110 L. Ed. 2d at 308, 110 S. Ct. at 2415-16, citing *Gates*, 462 U.S. at 227, 76 L. Ed. 2d at 541, 103 S. Ct. at 2326. The Court stated that the Vanessa White anonymous tip, standing alone, did not justify a *Terry* stop. *White*, 496 U.S. at 329, 110 L. Ed. 2d at 308, 110 S. Ct. at 2416, citing *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880.

The Court placed special emphasis on the informant's prediction of future behavior, which demonstrated a "special familiarity" with

the affairs of the suspect. *White*, 496 U.S. at 332, 110 L. Ed. 2d at 310, 110 S. Ct. at 2417. The Court also stated that the stop was valid because of the police officers' independent corroboration of significant aspects of the informer's predictions. The corroboration imparted a degree of reliability to the balance of the informant's predictions. Specifically, the Court found important that the officers corroborated Vanessa White's departure from the designated apartment in the Plymouth and the fact that she drove the most direct route towards the designated motel. *White*, 496 U.S. at 331, 110 L. Ed. 2d at 309-10, 110 S. Ct. at 2416-17.

An Illinois case, *People v. Moraca*, 124 Ill. App. 3d 561, 464 N.E.2d 312 (1984), involves an anonymous tip factually similar to the Yarber tip. In *Moraca*, a police officer, manning the Catch A Thief With Citizen's Help (CATCH) telephone line, received an anonymous tip that Giulio Moraca drove a blue van and was in the possession of a machine gun and cannabis. *Moraca*, 124 Ill. App. 3d at 562, 464 N.E.2d at 313. The informant provided the blue van's license plate number. The informant further indicated that Giulio Moraca frequented an area in Elgin, Illinois. The officers drove into the designated area of Elgin and located a blue van with the specified license plates. A license plate check revealed that the van was registered to a lawn care business. The officers departed the area and returned in 20 minutes, observing the van being driven away by a white male. The police officers observed nothing unusual or suspicious about the manner in which the van was driven. The officers stopped the van. The van driver got out of the van and walked back towards the police vehicle, at which time he was ordered to move against the side of the van to be frisked. *Moraca*, 124 Ill. App. 3d at 563, 464 N.E.2d at 313. A machine gun was found in the van. *Moraca*, 124 Ill. App. 3d at 563, 464 N.E.2d at 314. The police officers asked for identification and ascertained that the van's driver was in fact Giulio Moraca. Cannabis was found on his person. *Moraca*, 124 Ill. App. 3d at 563, 464 N.E.2d at 314.

The court in *Moraca* found that although the standard in a *Terry* stop was less than that required for a probable cause determination, the anonymous telephone call failed to establish that the informant was honest or reliable or that there was any basis for the informant's knowledge of Giulio Moraca's illegal activities. *Moraca*, 124 Ill. App. 3d at 566-67, 464 N.E.2d at 316. The court concluded that corroboration of the presence of a blue van in Elgin with the specified license plates was insufficient to justify a *Terry* stop, and the court held that the stop violated Giulio Moraca's constitutional rights. *Moraca*, 124 Ill. App. 3d at 567, 464 N.E.2d at 316.

■ In this case, the parties do not dispute the fact that the officers conducted a *Terry* stop at the Amtrak station. While the officers testified that Yarber was always free to go, the officers acknowledged that Yarber was not free to take his bags. Five officers stayed near Yarber while efforts were made to secure a narcotics detection canine unit. The officers requested Yarber's identification and conducted a limited search of his person. The shortest estimate of the length of this detention was 15 minutes.

The officers freely admitted that the only basis for the stop was the anonymous tip, and they further admitted that Yarber engaged in no suspicious or unusual activity from the time he exited the Amtrak train until the moment of the initial police contact. Therefore, at issue is whether the anonymous tip and factual corroboration provided the officers with a reasonable and articulable suspicion to stop Yarber as he exited the train.

The anonymous tip received on the Crimestoppers line provided general details about Yarber's appearance and residential and employment status. The tip also included details of alleged criminal activity and further predicted a future criminal activity. However, nothing about the tip established the informant's basis of knowledge. The anonymous informant did not indicate that she witnessed any criminal activity. The tip contained only hearsay reports of other individuals. As the informant was anonymous and had previously provided no correct information to the Carbondale police department, there is no way to determine the reliability of the informant. The prediction of future activity lends some degree of credibility to the tip. *White,* 496 U.S. at 332, 110 L. Ed. 2d at 310, 110 S. Ct. at 2417. Standing alone, the anonymous tip, without corroboration, was clearly insufficient to justify a *Terry* stop.

The Carbondale police officers corroborated numerous innocent details of Samuel Yarber's life. The officers confirmed his general height, weight, race, employment, and residential address. The officers were unable to independently verify any of the informant's allegations of criminal activity. The officers were unable to corroborate that Yarber left Carbondale on November 8, 1994. The "witness" at the Amtrak station stated that he was "almost positive" that Yarber was in the station earlier that day. Being almost positive falls far short of a positive identification. Even so, this witness did not place Yarber on the Amtrak train. The officers were unable to find one person who could establish that Yarber was, in fact, on board the November 8, 1994, Amtrak train bound for Chicago. The officers were similarly unable to determine that Yarber was on the November 9, 1994, Amtrak train from Chicago to Carbondale.

At the time the officers approached Yarber at the train station, they had only verified the static details of his life, similar to *Moraca*. A reasonable and articulable suspicion requires more than corroboration of innocent details. Without verification of any other portion of the informant's tip, for all the police knew, Samuel Yarber was the victim of a malicious prank. The failure to corroborate anything other than innocent minutia is what distinguishes this case from *White*. The police officers in *White* corroborated the travel route by direct observation. The quality, and not the quantity, of corroboration is significant in determining that the officers have a reasonable and articulable suspicion to stop a person suspected of criminal activity.

When the reliability of the information obtained from an anonymous informant cannot be easily corroborated, and there are no other suspicious circumstances known to the officer, depending upon the totality of the circumstances, a stop may not be warranted. *People v. Scott*, 249 Ill. App. 3d 597, 602, 619 N.E.2d 809, 814 (1993).

We find that there were no reasonable grounds upon which the Carbondale police officers could stop Yarber at the Amtrak station. Any evidence obtained as a result of Yarber's unconstitutional detention was properly suppressed.

Furthermore, even if the stop was valid, we find that the seizure of Yarber's two bags violated his constitutional rights. The principles of *Terry* permit a brief investigative seizure of luggage if the officers have a reasonable, articulable suspicion that the luggage contains contraband or other evidence of criminal activity. *United States v. Place*, 462 U.S. 696, 706, 77 L. Ed. 2d 110, 120, 103 S. Ct. 2637, 2644 (1983). Employing the same totality of the circumstances analysis to the seizure of Yarber's luggage, it is clear that the anonymous tip factual corroboration was insufficient to raise a reasonable suspicion that the luggage contained cannabis.

Furthermore, *Place* calls for an intrusion limited in time, emphasizing the importance of the "brevity of the invasion of the individual's Fourth Amendment interests." *Place*, 462 U.S. at 709, 77 L. Ed. 2d at 122, 103 S. Ct. at 2645. If the length of the detention is not brief under the circumstances, and if probable cause does not exist, the seizure is not reasonable. *Place*, 462 U.S. at 709, 77 L. Ed. 2d at 122, 103 S. Ct. at 2645. Because the law enforcement officials knew that Mr. Place was scheduled to arrive at La Guardia at a specific time, the Supreme Court held that the officials had ample time to arrange for additional investigative measures necessary to establish probable cause and minimize the intrusion. *Place*, 462 U.S. at 709, 77 L. Ed. 2d at 122, 103 S. Ct. at 2646. Under those circumstances, a 90-

minute seizure was deemed unreasonable. *Place*, 462 U.S. at 710, 77 L. Ed. 2d at 122-23, 103 S. Ct. at 2646.

As in *Place*, the Carbondale police officers believed that Yarber was on a specific train. The officers knew when that train was scheduled to arrive. The officers knew for at least four hours prior to the train's arrival that Jasper was unavailable to work in public places, yet the officers made no alternative arrangements. Upon Yarber's refusal to consent to the search of his bags, and without probable cause to arrest or to obtain a search warrant, the officers seized Yarber's bags. Under the circumstances in existence at the time of the seizure, and given the length of time from the seizure to Jasper's alert, the seizure was also unreasonable in duration.

As we find that the initial stop and the subsequent luggage seizure were invalid, the trial court's suppression order was not against the manifest weight of the evidence.

The order of the circuit court of Jackson County is affirmed.

Affirmed.

MAAG and WELCH, JJ., concur.