583 So.2d 895 (1991)
STATE of Louisiana
v.
Edward Charles THOMAS.
No. KA 90 1108.
Court of Appeal of Louisiana, First Circuit.
June 27, 1991.
*896 Walter J. Senette, Jr., Asst. Dist. Atty., Franklin, for the State.
Robert Miller, Don J. Hernandez, Indigent Defender Bd., Franklin, for Thomas.
Before EDWARDS, WATKINS and LeBLANC, JJ.
LeBLANC, Judge.
Defendant, Edward Charles Thomas, was charged by bill of information with possession of cocaine, a violation of LSA-R.S. 40:967C. He pled not guilty and filed a motion to suppress physical evidence and statements he made to the police. The trial court denied the motion. Defendant withdrew his plea of not guilty, pled guilty as charged and reserved his right to appellate review of the trial court's denial of his motion to suppress. See State v. Crosby, 338 So.2d 584 (La.1976). He was sentenced to imprisonment at hard labor for five years; however, the trial court suspended the sentence and placed defendant on supervised probation for five years, subject to various conditions. Defendant now appeals, urging in a single assignment of error that the trial court erred by denying the motion to suppress.
At the suppression hearing held in this case, the state presented the testimony of Police Detectives Sabra Hill,[1] Lenis Landry, III and Charles T. Cossey. Defendant did not present any evidence. A summary of the testimony of the state's witnesses follows.
At about 2:00 p.m. on January 23, 1990, a confidential informant (the first CI) talked to Hill about certain drug activity occurring around Swain's Bar in Franklin, Louisiana. The first CI had talked to Hill on the preceding night about "problems at Swain's" and had informed Hill that she would contact her the next day. During this conversation, the first CI told Hill that a large shipment of cocaine had "just" arrived in the Franklin area from the Houston area and was being sold in the St. Joseph area around Swain's Bar. The first CI advised Hill that the cocaine had been brought into the St. Joseph area by Chris Bias, who had several drug dealers in front of Swain's Bar dealing narcotics; the first CI also provided Hill with names of some individuals who were at that time selling narcotics at this location.
The first CI told Hill she had watched several drug transactions take place, and she volunteered to go back to the area of Swain's Bar and obtain additional information for Hill. Consequently, the first CI made several trips to the location on January 23. After the first CI's last trip, she gave Hill her final communiqué of the day concerning the drug activities at Swain's Bar after dark at about 8:40 to 8:45 p.m. on January 23.
Swain's Bar has an awning in front of it and a parking lot on one side. The area is unlighted and very dark. There are houses on the other side of the bar and on the other side of the parking lot, and the bar faces a main thoroughfare, Sterling Road.
Regarding the drug activity that was occurring at Swain's Bar, the first CI related to Hill that most of the people "out there" dealing for Bias carried weapons and would have weapons in their possession. The first CI told Hill that on the preceding night, January 22, a shot had been fired at an individual in connection with what drug dealers call a "rip-off". Hill testified that the first CI stated that it was a very dangerous situation in that area and that the police could get themselves killed if they were not careful.
*897 Although Hill testified that she normally speaks to the first CI several times a day and that this CI had previously given her information which had led to arrests and convictions for narcotics offenses as well as the recovery of narcotics, Hill contacted another confidential informant (second CI) to check the reliability of the information the first CI had given her on January 22 and 23. The second CI gave Hill information confirming that provided by the first CI, i.e., that a shipment of cocaine had just arrived in the Franklin area and that there was a "lot of activity" at Swain's Bar. The second CI, who had been present at the bar at the time of the shooting which had occurred there on the night of January 22, told Hill about the shooting and the weapons. Relative to the reliability of the second CI, Hill testified that this informant had participated in an undercover drug operation in which several warrants had been obtained for searches and/or arrests of persons who sold narcotics, and that this informant had given her information in the past which had led to arrest(s) and the recovery of drugs.
During her final communiqué to Hill, which occurred about twenty minutes before Detectives Hill, Landry, Cossey and other law enforcement officers arrived at Swain's Bar, the first CI named certain persons whom she actually saw "passing" drugs for money at Swain's Bar. Those persons included Bias, Trent Domingue, Kenny Parsons and Joe Wiggins. The first CI advised Hill there were other people at the bar "passing something" and receiving money, although she indicated that she did not see "actual drugs" being passed by these individuals. In this final communiqué, the first CI mentioned defendant's name and advised Hill that, although she did not see defendant holding narcotics or transacting drug deals, defendant was "out there" where the drug transactions were occurring and that defendant was a known narcotics dealer for Chris Bias in the area of Swain's Bar.
On the basis of the information she had received from the two CI's, Hill, Landry, Cossey and several other police officers proceeded to Swain's Bar for a narcotics investigation. The officers arrived at Swain's Bar at about 9:00 p.m., only approximately fifteen to twenty minutes after Hill had received her last information from the first CI. The assistance of the other police officers had been secured upon learning of the particular danger that could be involved in this investigation.
Detective Landry, who was apparently among those officers who arrived first at Swain's Bar, initially stopped defendant. Landry was from New Iberia rather than Franklin. He had not previously seen defendant. However, Landry knew Chris Bias, one of the persons in the group of subjects, including defendant, standing in front of the Bar when Landry arrived at the establishment. At that time, defendant was standing within about five to ten feet of Bias. Immediately upon his arrival, Landry advised the group of subjects that he was a police officer and that the police were conducting a narcotics investigation; he told the subjects to place their hands on the wall.
Defendant complied with Landry's instructions by placing his hands on the wall. Landry then patted down defendant for weapons, and, during the pat down, found a knife in defendant's left rear pants pocket. Upon finding the knife, Landry placed defendant under arrest for carrying a concealed weapon. Landry then conducted a further search during which he found a plastic bag containing a white powdered substance (suspected cocaine) inside defendant's wallet, which was also in defendant's left rear pocket.
Cossey testified that he participated in the narcotics investigation in question. When he initially observed defendant at the scene of the investigation, defendant was already in the custody of Detective Landry, who had placed defendant under arrest for carrying a concealed weapon. Following seizure of the suspected cocaine and defendant's arrest on a drug charge in connection with that seizure, defendant made statements to Cossey during booking procedures at the Franklin Police Department, after defendant had been given his Miranda rights, to the effect that the cocaine *898 found on defendant's person was his and that he had purchased it earlier that evening. No one else was present.
Detective Hill testified that when she arrived at Swain's Bar "just a moment" after the officers who first arrived at the scene, the ten to thirteen subjects that were detained in the parking lot and the front area of Swain's Bar were already being patted down for purposes of the officers' safety. Hill stated that only those subjects who were in the area where the narcotics dealing was occurring were detained and patted down. She testified that prior to stopping defendant, Landry knew about the danger of the weapons, a matter that was stressed to the officers because of the first CI's concern about weapons. Hill explained in her testimony that, based on the first CI's information about defendant being a narcotics dealer and narcotics dealers in the area in question holding weapons, the officers felt defendant should be patted down for weapons as a safety measure.
On appeal, defendant argues that the officers had no reasonable basis to connect him with any alleged criminal activity prior to stopping and frisking him, i.e., the officers had nothing prior to the stop to suggest that the tip was anything more than casual rumor or accusation. Consequently, defendant asserts that the trial court erroneously denied his motion to suppress the knife and narcotics. Defendant claims that because the frisk and subsequent search were unreasonable, his arrests were illegal; as a result, the statements he made during booking procedures should also have been suppressed as fruits of the poisonous tree.
The Fourth Amendment to the United States Constitution and Article I, § V, of the Louisiana Constitution protect people against unreasonable searches and seizures. However, the right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by LSA-C.Cr.P. Article 215.1, as well as by the federal and state jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195, 1198 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interferences. State v. Payne, 489 So.2d 1289, 1291 (La. App. 1st Cir.), writ denied, 493 So.2d 1217 (1986). The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. State v. Belton, 441 So.2d at 1198; State v. Bracken, 506 So.2d 807, 811 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (1987). An informant's tip can provide a police officer with reasonable cause to support a Terry stop. Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923-1924, 32 L.Ed.2d 612 (1972); State v. Woods, 406 So.2d 158, 159 n. 2 (La.1981). In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), a case which dealt with an anonymous tip in the probable cause context, the United States Supreme Court abandoned an inflexible application of the "two-pronged" test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) in favor of a "totality of the circumstances" analysis in determining whether or not an informant's tip establishes probable cause. The Gates Court held that the informant's "basis of knowledge" and his "veracity" or "reliability," factors, which had been critical under Aguilar and Spinelli, remained highly relevant in determining the value of the informant's report. Alabama v. White, ___ U.S. ___, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (a case which dealt with an anonymous tip in the reasonable suspicion context). The "basis of knowledge" and "veracity" or "reliability" of an informant are factors which are also relevant in the reasonable suspicion context; however, in applying these factors in the reasonable suspicion context, allowance must be made for the lesser showing required *899 to justify an investigatory stop. See Alabama v. White, 110 S.Ct. at 2415. In Alabama v. White, at 110 S.Ct. 2416, the Court stated:
Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Adams v. Williams, supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S., at 147, 92 S.Ct., at 1923-24. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factorsquantity and qualityare considered in the `totality of the circumstancesthe whole picture.' United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d, 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The Gates Court applied its totality of the circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable suspicion context, the only difference being the level of suspicion that must be established.
As in Adams v. Williams, the information provided to Detective Hill was furnished by informants known by the police. The "veracity" or "reliability" of both CI's in the instant case was well-established. The first CI had previously provided Hill information which had resulted in narcotics arrests, convictions and the recovery of drugs; similarly, the second CI had supplied Hill with information in the past which had led to arrest(s) and the recovery of drugs. Evidence presented at the suppression hearing indicated that the "basis of knowledge" for the information provided by both CIs (with the exception of the information of the first CI alleging defendant to be a known narcotics dealer for Chris Bias in the area of Swain's Bar) was through personal observation at the location of the illegal drug activities referenced in the information each of the CIs supplied to Detective Hill. The information related to Hill by the first CI revealed that a large shipment of cocaine that had been brought in by Chris Bias had "just" arrived in the St. Joseph area where it was being sold near Swain's Bar by drug dealers Bias had at that location. The first CI (in her final communiqué to Hill concerning the ongoing illegal cocaine sales at the Swain location) named Chris Bias and several other persons as those actually making the drug sales; in this final communiqué (which was made only minutes before police arrived at Swain's), the first CI first mentioned defendant's name. Although the first CI did not see defendant holding drugs or transacting any drug sale, she advised Hill that defendant, a known narcotics dealer for Chris Bias in the area in question, was "out there" where the drug transactions were taking place. During her communications to Hill, the first CI described a drug-related shooting that had occurred on the preceding night and informed Hill that most of the individuals dealing drugs for Bias carried weapons and would have weapons on their persons. The second CI's information served to verify that of the first CI that a cocaine shipment had "just" arrived, the incident of the previous night regarding the shooting, and to generally confirm *900 (without naming any drug participants[2]) the drug activities that were described by the first CI as occurring at that location. When the police arrived at Swain's Bar only minutes after Hill received the final communiqué from the first CI, they observed a group of subjects on the parking lot and in the area in front of the bar. In the group were persons named by the first CI, including defendant who was standing a short distance from Bias.
Notwithstanding defendant's contentions to the contrary, we find that the information given to the police by the first CI, an informant of proven reliability, (with the exception of her allegation that defendant was a known narcotics dealer for Chris Bias in the area of Swain's Bar) carried a relatively high degree of reliability under the particular facts and circumstances present in this case. While the allegation of this informant of proven reliability that defendant was a drug dealer for Chris Bias in the area of Swain's Bar remained unverified and was clearly of a lower degree of reliability than the other information furnished in the informant's tip, the other information provided by this informant, together with the observations of the police when they arrived at Swain's Bar in response to the tip, added to the indicia of reliability of this allegation. Nonetheless, considering both the quantity and quality of the various components of information possessed by the police in this case in the light of the "totality of the circumstances the whole picture," we conclude that there was reasonable suspicion for a Terry stop of defendant. Although this information when so considered does not establish probable cause to arrest defendant, the officers had reasonable cause to believe that defendant had been or was about to be engaged in criminal conduct involving drugs and/or weapons. Such a conclusion reasonably flows from the facts and circumstances. According to an informant of proven reliability, defendant was a dealer of narcotics for Chris Bias in the area of Swain's Bar; most of the persons who were dealing drugs for Bias at that location carried weapons. Defendant was found in close proximity to Bias at the bar when the police arrived at the location moments before defendant was detained by the police as part of a group of individuals who were there at night in the darkened location. According to the tip, (only a short time before the detention of defendant and others) several of the individuals in the group (not including defendant) had been observed by the first CI participating in drug transactions. Such transactions had been observed by the informant throughout the afternoon and into the night on the day in question; thus, these transactions were part of ongoing criminal conduct at the site. These circumstances justifying the investigatory stop of defendant also justified a self-protective frisk of defendant for weapons by Detective Landry. When the officer discovered the knife, he had probable cause to arrest defendant for illegally carrying a concealed weapon. The ensuing search incident to the lawful arrest produced the cocaine. Cf. State v. Woods, supra.
Accordingly, we find that the discovery and seizure of the knife was the product of a lawful frisk for weapons. The seizure of the cocaine was the product of a search incident to a lawful arrest. The lawful seizure of the cocaine supported defendant's lawful arrest for the drug offense; and, because the seizures and arrests were lawful, the subsequent statements made by defendant were free of any alleged taint and not fruits of the poisonous tree.
Defendant's assignment of error is without merit, and his conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] We note that, although Detective Hill's first name is spelled "Sabria" in the defense brief, the spelling "Sabra" is used in the suppression hearing transcript.
[2] The second CI also did not mention defendant's name or indicate in any way that defendant was a narcotics dealer.