A97A1325. PECK v. THE STATE.
(491 SE2d 507)

MCMURRAY, Presiding Judge.

Defendant was tried before a jury and found guilty of possession of methamphetamine with intent to distribute, possession of marijuana with intent to distribute, and manufacturing marijuana. The evidence, including defendant's statements, revealed that Hall County Deputy Sheriff David Spillers received a tip indicating that defendant "was involved in marijuana distribution and possession

and that it was more than a street level type distribution, it was a distribution of larger quantities[, whereupon Deputy Spillers began] conducting surveillance." Deputy Spillers received a second tip indicating that defendant "had received a shipment of marijuana from his suppliers and that he currently had it in his possession and was preparing to distribute the marijuana." Deputy Spillers directed another officer "to prepare a search warrant and affidavit based on the information [the officers] had at the time and the corroboration of [t]hat information. . . . Shortly after 5:20 p.m. [defendant] came from his driveway in a gray van, small gray van and traveled down the street towards Lawson Robinson Road. [Deputy Spillers] followed. When [defendant] turned onto Lawson Robinson Road [Deputy Spillers] signaled for [defendant] to stop with [his] blue emergency light and [defendant] responded appropriately. . . ." Deputy Spillers was suspicious that defendant may have been "delivering some of the marijuana."

Deputy Spillers "approached the driver's side window of the gray van that [defendant] was operating, identified [him]self to [defendant], . . . showed him [his] badge of office and asked [defendant] was he Maurice Peck and [defendant] replied in the affirmative, and [Deputy Spillers] asked him, 'Are you also known as Elvis?' And he replied, 'Yes,' and 'Why?'" Deputy Spillers told defendant he was stopped "because of an allegation made against him of marijuana distribution and marijuana possession, and that it was [Deputy Spillers'] understanding that [defendant] had some marijuana at his residence." Defendant "kind of dropped his head, looked down at the floorboard of the car and replied, 'Yes, I know what this is about,' and that, 'I've got some at home.'" Deputy Spillers "asked [defendant] if he would mind returning back to his home with [the deputy] and retrieving that marijuana, and [defendant] replied that no, he didn't mind."

Defendant led the officers "into a shed at the end of the driveway. [He] had some keys in his hand, was shuffling through the keys. As [they] walked into the doorway of the shed [defendant] turned to his right and located a particular key, unlocked a red rollaway tool chest and slid the bottom drawer out and when he did [the officers] could see several gallon-sized plastic Ziploc bags containing marijuana." Defendant and his wife (now deceased) each gave their written consent to search the premises, after signing written *Miranda* waiver forms. In the shed, officers found a set of triple beam scales, a white plastic trash sack containing some marijuana, and a five-gallon plastic bucket holding "a couple of quart jars, mason type jars, that each contained marijuana." Inside defendant's home, "[u]nderneath the lavatory, . . . there [were] two gallon Ziploc plastic bags, each containing marijuana. . . ." Thirty-three marijuana plants were

found on the property, including "seedlings [that had] just . . . germinated and come out of the ground and put on their first true leaves." A "wire cage and frame [protected] those young plants." The more mature plants "would be ready to harvest in about a month's period of time." In defendant's truck the officers found "some plastic bag material and some self-adhesive bandaging material that contain[ed] approximately 13 grams of amphetamine powder inside that material." This was "underneath the driver's seat tucked up in the seat springs." Defendant also led officers "to a small quantity of marijuana in his bedroom."

All told, the officers seized "Eight point three pounds [of marijuana], approximately," not counting the growing plants. At "sixteen hundred dollars a pound, [that represented] about ten or eleven thousand dollars worth." From the judgment of conviction entered on the jury's verdicts, defendant brings this direct appeal. *Held:*

1. Defendant first contends the trial court erred in admitting the items seized from defendant's home, arguing they are the fruits of an illegal arrest and illegal warrantless search.

(a) "Where a law enforcement officer has probable cause to believe that a vehicle (as opposed to a particular container within the vehicle), while in transit, contains contraband; i.e., where the objective facts known to the officer would justify issuance of a search warrant authorizing that a vehicle be searched, the 'automobile exception,' *Carroll v. United States*, 267 U. S. 132 (45 SC 280, 69 LE 543) (1925), to the warrant requirement of the Fourth Amendment applies, and a warrantless search of the entire vehicle is not unconstitutional. . . ." (Footnote omitted.) *Love v. State*, 254 Ga. 697, 698-699 (334 SE2d 173). In the case sub judice, based on the two corroborated tips, Deputy Spillers had probable cause to believe that defendant was distributing marijuana using the gray van. *Gilbert v. State*, 212 Ga. App. 308 (1), 309 (441 SE2d 785). Thus, the initial stop was authorized. The analysis employed by the special concurrence is not erroneous. It is, however, inapplicable.

(b) Defendant's roadside admission that he possessed marijuana at his home was not the product of custodial interrogation but was spontaneous on defendant's part. *Leatherwood v. State*, 212 Ga. App. 342, 343 (2) (441 SE2d 813).

(c) " 'Once a voluntary consent is legally obtained, it continues until it either is revoked or withdrawn. (Cits.)' *Mallarino v. State*, 190 Ga. App. 398, 403 (2) (379 SE2d 210) (1989). ' "A valid consent eliminates the need for either probable cause or a search warrant. (Cit.)" ' *Wright v. State*, 189 Ga. App. 441, 444 (1) (375 SE2d 895) (1988)." *Boggs v. State*, 194 Ga. App. 264 (390 SE2d 423). " '(W)hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defend-

ant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. . . .' *United States v. Matlock*, 415 U. S. 164, 171 (94 SC 988, 39 LE2d 242, 249-250) (1974). Accord *Walker v. State*, 179 Ga. App. 782 (347 SE2d 711) (1986); *Wilson v. State*, 179 Ga. App. 780 (347 SE2d 709) (1986)." *Pupo v. State*, 187 Ga. App. 765, 767 (5) (371 SE2d 219). In the case sub judice, the written consent to search signed by defendant's terminally ill wife was never revoked or withdrawn. Moreover, there is nothing in the transcript to show that, contrary to the statement she signed, *her* consent was in fact not freely and voluntarily given. *McClure v. State*, 166 Ga. App. 864 (1) (305 SE2d 456). The trial court did not err in admitting the contraband seized over defendant's objections as to the absence of probable cause and the warrantless search.

2. Defendant enumerates the general grounds. In light of our holding in Division 1 that all the contraband seized was admissible, the evidence was sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) to authorize the jury's verdicts that defendant is guilty, beyond a reasonable doubt, of possessing both marijuana and methamphetamine with the intent to distribute and of manufacturing marijuana, as alleged in the indictments.

*Judgment affirmed. Beasley, J., concurs specially. Smith, J., concurs in the judgment only.*

BEASLEY, Judge, concurring specially.

I fully concur in Divisions 1 (b), 1 (c) and 2, but I do not concur in the analysis in Division 1 (a).

In the trial court and on appeal, Peck challenged the stop as being in violation of his federal constitutional rights. Accordingly, the test is whether the officer had a "reasonable suspicion" that Peck was engaged in criminal activity at the time. *Alabama v. White*, 496 U. S. 325, 329-331 (110 SC 2412, 110 LE2d 301) (1990). That is what is needed to make an investigative stop, which is what the officer testified he was engaged in and what it was in fact. *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968); *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979).

The officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *United States v. Sokolow*, 490 U. S. 1, 7 (109 SC 1581, 104 LE2d 1) (1989). A stop "must be justified by 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Vansant v. State*, 264 Ga. 319, 320 (2) (443 SE2d 474) (1994). The officer must have knowledge of something which would " 'warrant a man of reasonable caution in the belief'

that [a stop] was appropriate." *Terry*, supra at 22. The totality of the circumstances is to be taken into account when determining whether the stop is constitutionally valid. *United States v. Cortez*, 449 U. S. 411, 417 (101 SC 690, 66 LE2d 621) (1981).

To stop a person in a vehicle from proceeding as the person intends thus requires a lower grade of justification than probable cause, which is needed to arrest or search. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, supra at 330.

So, the unverified tip of an informant may carry enough indicia of reliability to justify the officer's forcible stop of the person operating the vehicle. *Adams v. Williams*, 407 U. S. 143, 147 (92 SC 1921, 32 LE2d 612) (1972). In that case, the informant, who was known to the officer personally and had provided information in the past, approached the officer and advised that a person seated in a car nearby was carrying narcotics and had a gun at his waist. The information was immediately verifiable by a stop, and if it was untrue, the informant was subject to arrest for making a false complaint.

Officer Spillers stopped Peck on the strength of two telephone calls from an unidentified "confidential source" whose information had prompted Spillers and two other officers to surveil Peck's house. The three officers were in Spillers' unmarked police pickup truck, with one of the officers in the bed of the truck while they watched Peck's mobile home. When Peck exited his home and began to drive off in a small gray van, Officer Spillers stopped him by using the blue emergency light on his dashboard. Peck was halted at a stop sign at an intersection the distance of seven premises from his home, at about 5:20 p.m. on the evening of June 9, 1995.

The source had called Spillers about 3:30 p.m. that afternoon, named Peck as being involved in more than a street level type distribution of marijuana and gave details as to how the distribution took place, from where the marijuana was supplied and by whom, the vehicles involved in delivering it to him, the way he distributed it and where it was kept. The source had given Spillers information for about two years, most often by telephone, and the information had been corroborated in at least two other drug investigations although no action was taken and no arrests made.

The source stated that within the past week the source had been at Peck's home and personally observed a quantity of marijuana being kept and stored there in Peck's possession. The source was described as "a mature person who has previously been involved in

similar types of criminal activity." The source described the residence and its location and said the source had a close relationship with Peck. The source made statements to Officer Spillers that were against the source's penal interest. The source supplied Peck's wife's name and stated they owned a 1987 Ford Ranger pickup truck. This was verified, as was their residence and directions to it.

The second telephone call from the confidential source came before the stop. The source advised that Peck received a shipment of marijuana from his suppliers, currently had it in his possession, and was preparing to distribute it. In one of the calls the source stated that Peck "occasionally" would make deliveries. The officer stopped Peck on the suspicion that he might be delivering some of the marijuana, although he testified that he told Peck he stopped him because he had information Peck had marijuana at his residence.

Although the vehicle Peck used to leave his residence was different from the one the source had described and which was confirmed as belonging to Peck and his wife, and although the information was only that Peck "occasionally" made deliveries, it was not unreasonable or a mere hunch, caprice, or inclination that Peck was in possession of marijuana when he drove off. See *Jorgensen v. State*, 207 Ga. App. 545, 546 (428 SE2d 440) (1993). According to the source, there was drug activity that day, by way of Peck's receipt of a shipment, and it would be reasonable to deduce that Peck was beginning to distribute it so as to move it out of his house in exchange for money.

On this basis, I concur that the investigative stop did not contravene Peck's Fourth Amendment right to be free of unreasonable seizure. Compare *State v. Williams*, 225 Ga. App. 736 (484 SE2d 775) (1997), where the information which prompted the invalid stop came only from an anonymous tipster, was not corroborated, and was not detailed.

DECIDED AUGUST 27, 1997.

*Robert E. Andrews*, for appellant.
*Lydia J. Sartain, District Attorney, Lucy K. Henry, Assistant District Attorney*, for appellee.