¶ 22. On the facts of this case, I do not believe the officers had the authority to make either an investigative stop or an arrest. Therefore, I dissent.
¶ 23. The majority holds that the investigative stop was justified because of what the officers witnessed and the information conveyed by a confidential informant. As to what the officers witnessed, the record reflects that one officer in a marked police car went to the area of the intersection and observed three black males standing on one of the corners of the intersection. Two different vehicles arrived at the intersection, and the individuals approached the vehicles. Shortly thereafter, the vehicles drove away. The reliable confidential informant had said the individuals were selling drugs at the intersection, but no drugs were found.
¶ 24. There are any number of legal things that these three black males could have been doing at the intersection; therefore, I cannot agree that the officers had either probable cause or reasonable suspicion to stop or arrest them. For example, there could have been a surprise birthday party going on at the apartment, and the individuals were stopping persons to give instructions where to park to prevent the honoree from discovering the surprise. The three individuals certainly had a First Amendment right to freedom of assembly, and that right does not circumscribe where *Page 897 
they may congregate so long as they are not committing a trespass.
¶ 25. According to the testimony of Investigator Drexler on the motion to suppress, he received information from a reliable confidential informant that the three individuals were stopping cars at the entrance to Kingsway Apartments and selling drugs and that the confidential informant did not believe the individuals were residents of the apartment complex. Drexler further testified that, according to the confidential informant, the individuals were standing in an area posted with no loitering signs and appeared to be trespassing on the property. It is interesting to note, however, that neither of the individuals was charged with loitering nor trespass. If in fact they were trespassing, this would have provided a proper basis for arresting them. Further, it appears that the individuals were not trespassing. This is what Officer Cagle testified to on the motion to suppress:
 Q. And you didn't observe any violation of law by any of these people up until this allegation that Mr. Linson ran or tried to exercise his right not to cooperate?
 A. We were — we came into the area intentionally to act on the information that was provided by Drexler's source. We contacted Farmer (a fellow police officer) and then at that point we acted on what he observed and what he was doing at that point. But as far as seeing Mr. Linson or anyone else doing anything initially or where I would make arrest myself, no, I did not. Other than when he pushed Officer Farmer and then subsequently —
 * * * *
 Q. And no drugs were found?
 A. No, sir.
 Q. Did you see anyone commit an offense in your presence?
 A. That's a difficult question to answer.
 Q. Other than what you claim, you're going to claim is an offense by Mr. Linson by trying to walk away, did you see any other illegal activity?
 A. No, sir.
¶ 26. I will agree that the individuals' conduct was consistent, in part, with the modus operandi of street drug peddlers. However, since no one saw the individuals pass anything to any of the occupants of the cars that stopped, their conduct, in my opinion, was also consistent with other innocent activity. If something was being exchanged between the individuals and the occupants of the cars, maybe that conduct would be suspicious enough to justify an investigative stop, but that was not the case.
¶ 27. Moreover, when Officer Farmer, the officer in the marked police car, arrived at the location of the individuals, they had already moved from the spot where the confidential informant reported they were. This is what Officer Farmer said:
 Q. Okay. Then what happened when you got there?
 A. They had already walked back to the entrance way of Kingsway Drive whenever I pulled up. I pulled up right in front of them. I got out of the vehicle. At that point they started to turn around and disburse.
 * * * *
 Whenever I got out on them, they walk — separating and walk off. At that point I told them to stop, turn around and come back, which two of them came back. I asked them to place their hands on the car. At that point Mr. Linson had walked over closer to one of the apartments on the *Page 898 
left side of the entrance and appeared to be very nervous, walking back and forth.
¶ 28. It appears clear to me that Linson was arrested because he simply exercised his constitutional right not to talk to the officers. In my judgment, on these facts, he had a right to do just that. As stated, I do not believe that there was sufficient evidence to justify either an investigative stop or an arrest.
¶ 29. The majority places great weight, as indeed they must, on what Officer Cagle said the confidential informant reported to him. In the typical situation, information reported by a confidential informant would be reduced to writing and related to a detached magistrate who would decide whether the information was credible enough to issue a search warrant for a specific location or an arrest warrant for a specific individual. Since these individuals were subject to leaving the scene at any moment, it is understandable that the informant's information could not be scrutinized first by a judicial officer to determine if there was sufficient information to issue an arrest warrant. Therefore, in situations like this one, the question is: Did the law enforcement officer, in checking out the information known to him, act reasonably in stopping the individual or vehicle?
¶ 30. I want to be clear. I do not take issue with the well-settled law in this state that in a proper situation, law enforcement officers may make an investigative stop and temporarily detain a person for the limited purpose of checking out a complaint or tip. Neither do I take issue with the majority's statement that a confidential informant's tip can be sufficient to justify an investigative stop short of an arrest. What I do take issue with is whether this tip — which did not contain any specific and unique information capable of being known only to the informant and those associated with the criminal activity — was sufficient to justify the search.
¶ 31. The majority cites Neely v. State ex rel. Tate County,628 So.2d 1376 (Miss. 1993), and Floyd v. City of Crystal Springs,749 So.2d 110 (Miss. 1999), for the proposition that a tip from a proven reliable confidential informant can constitute reasonable suspicion sufficient to justify an investigative stop. That is true, depending on the nature of the tip. I do not read either of these cases to stand for the blanket proposition that every tip from a reliable confidential informant constitutes reasonable suspicion to justify an investigative stop. Each tip must be examined in the context of the totality of the circumstances of the case.
¶ 32. In Neely, Deputy Hulette of the Tate County Sheriff's Department received a telephone call from a confidential informant that "Neely was dealing crack and that Neely would be making a delivery that night. The CI also told Hulette that Neely would be travelling east on Arkabutla Road with crack in his vehicle." Neely, 628 So.2d at 1377. Officer Hulette went to Arkabutla Road and spotted Neely traveling along Arkabutla Road just as the CI said he would be. Id.
¶ 33. In deciding that Officer Hulette, relying on the CI's tip, acted properly in stopping Neely, our supreme court said, "The issue here is whether the information provided by the CI was sufficient under the interpretation of the Fourth and Fourteenth Amendments to the U.S. Constitution, as most recently pronounced in Alabama v. White, 496 U.S. 325
(1990)." Id. at 1379. The court then recited the pertinent White facts as follows:
 In White, there was information from an anonymous source that a certain person, the defendant, would leave a certain *Page 899 
place, at a certain time carrying an ounce of cocaine in a brown attache case and drive a particular vehicle to a certain destination. The officers went to the point of departure and observed the defendant leave and embark upon the most direct route to the alleged designation whereupon they stopped the vehicle.
Id.
¶ 34. Following the recitation of the relevant facts in White, the Mississippi Supreme Court opined:
 It is clear that White controls here. In fact, the officer in the case sub judice could have stopped Neely on the basis of the tip alone without any independent police corroboration. . . . In the case sub judice, the tip came from a known informant and the information supplied by this CI had been successfully used by the officer in the past. Based on his previous dealings with this CI, Hulette had reason to believe that the information the CI provided about Neely was true. Under those circumstances, the tip alone provided the necessary indicia of reliability to justify the stop because it came from a confidential informant, whose dealings with the officer had shown him to be honest and reliable.
 However, we will assume that the CI's tip did not rise to the necessary level of reliability to justify the stop. Thus, it becomes necessary to consider whether the stop could be sustained on the basis of the tip, as corroborated with the officer's independent police work. Here, the CI told the officer that Neely was travelling in a certain direction on a certain road and that Neely was headed out of town to sell the crack. Since the officer knew Neely, he apparently knew what kind of car Neely would be driving. Acting on the CI's tip, the officer went to Arkabutla Road. Shortly thereafter, he spotted Neely who was travelling in the direction that the CI said he would be travelling. As the White Court pointed out, what was significant was the CI's ability to predict Neely's future behavior, because it demonstrated inside information — a special familiarity with Neely's affairs. White, 496 U.S. at 332, 110 S.Ct. at 2417. Thus, the officer's independent police work coupled with the tip exhibited sufficient indicia of reliability to justify the investigatory stop.
Id. at 1379-80 (emphasis added).
¶ 35. The emphasized portion of the text quoted above illustrates that it is both the nature of the tip as well as the reliability of the informant that makes the tip legally sufficient to justify the investigatory stop. In other words, if the tip itself "bears indicia of reliability" and comes from a reliable confidential informant, nothing more is required to justify the investigatory stop. However, if the tip comes from a confidential informant but the tip itself does not bear indicia of reliability, that is, does not contain inside information indicating a special familiarity with the affairs of the person to be stopped, corroboration on the part of the officer is required.
¶ 36. Floyd v. City of Crystal Springs, 749 So.2d 110 (Miss. 1999), cited by the majority, does not support the majority's contention that the only requirement for making an investigatory stop is a tip from a confidential informant. The majority quotes the following from Floyd :
 Reasonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability. Adams v. Williams, 407 U.S. at 147, 92 S.Ct. at 1924. Reasonable suspicion is dependent upon both the content of the information possessed by the detaining officer as well as its degree of reliability. *Page 900 Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Both factors — quantity and quality — are considered in the "totality of the circumstances."
Majority Opinion at (¶ 13) (emphasis added). The italicized portion of the passage quoted above makes clear that if the officer is acting on the informant's tip alone, the tip must bear indicia of reliability.
¶ 37. In Floyd, Floyd was convicted of DUI after he was stopped on a tip provided by David Rogers, a citizen who had made complaints to Officer Leflore before. Floyd, 749 So.2d at 112 (¶ 4). Rogers approached Officer Gerome Leflore of the Crystal Springs Police Department at a gas station on Highway 27 and told him that an antique model red Mustang convertible, traveling at a high rate of speed in a reckless manner, was headed into town on Highway 51. Id. Because Officer Leflore was off duty at the time, he called the information in to the Crystal Springs Police Department which dispatched Officer Palmer to the intersection of Highway 27 and Highway 51. Id. Palmer saw a vehicle fitting the description and ultimately stopped it. Id.
¶ 38. Again, the obvious distinction between the tip in our case and tip in Floyd is the uniqueness of the information in Floyd, that is, an antique model red Mustang convertible, and the generalness of the information here, that is three black males. Moreover, the tip in Floyd
came from a citizen, not a paid informant, and was made in person. "A person who is not connected with the police or who is not a paid informant is inherently trustworthy when he advises the police a crime is being committed." Id. at (¶ 32) (quoting United States v.Sierra-Hernandez, 581 F.2d 760 (9th Cir. 1978)).
¶ 39. In an attempt to boost its position that law enforcement personnel are justified in relying on a tip from a confidential informant simply because the tip comes from a confidential informant, the majority cites the case of Florida v. J.L., 529 U.S. 266 (2000). The majority quotes a passage from J.L. which indicates that a confidential informant can be held responsible if his tip turns out to be fabricated. Majority Opinion at (¶ 14). Apparently, the majority reasons that that fact somehow creates all the necessary indicia of reliability. In my judgment, such a construction of J.L. is much too broad. In fact, I see nothing in J.L. that supports the majority's position on this issue.
¶ 40. In J.L., "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." J. L., 529 U.S. at 268. Nothing was known about the informant. Id. "Sometime after the police received the tip, two officers responded." Id. "They arrived at the bus stop about six minutes later and saw three black males `just hanging out [there].'" J.L., 529 U.S. at 268. "One of the three, J.L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." Id.
¶ 41. In holding that the officers were not justified in frisking J.L., the United States Supreme Court framed the issue and stated its conclusion this way: "The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not." Id. *Page 901 
¶ 42. The majority apparently mis-evaluates the dissent's observation that no cocaine was found on Linson or anyone else. I am well aware that it is not what the officers find or fail to find, after the fact, that is the focal point of the inquiry into whether the stop is justified. As stated, I do not take issue with the fact that a credible confidential informant's tip, without corroboration from an officer, may, in some instances, form the basis for an investigatory stop. This is simply not that kind of tip. As the Unites States Supreme Court said inAdams v. Williams, 407 U.S. 143, 147 (1972), a case involving a tip from a confidential informant, "[i]nformants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simply [sic] rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized."
¶ 43. Adams was one of the first cases to discuss the reliability of confidential informants. In Adams, "Police Sgt. John Connolly was alone early in the morning on car patrol duty in a high-crime area of Bridgeport, Connecticut. At approximately 2:15 a.m., a person known to Sgt. Connolly approached his cruiser and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." Id. at 144-145. Sgt. Connolly approached the vehicle to investigate the informant's report. Id. at 145. He tapped on the window and asked the occupant, Robert Williams to open the door. Id. When Williams rolled down the window instead, Connolly reached into the car and removed a fully loaded revolver from Williams's waistband. Id. The gun had not been visible from outside the car, but it was in precisely the place indicated by the informant. Id.
¶ 44. In discussing the reliability of the confidential informant issue, the Adams court said this:
 The informant here came forward personally to give information that was immediately verifiable at the scene. Indeed, under Connecticut law, the informant might have been subject to immediate arrest for making a false complaint had Sgt. Connolly's investigation proved the tip incorrect.
Id. at 147. (emphasis added).
¶ 45. The majority acknowledges that at the time of Linson's arrest Mississippi's law was not comparable to Connecticut's regarding penalties for making false criminal complaints to law enforcement. However, the majority still attempts to boost its position that the required indicia of reliability is inherent in all information supplied by a known informant because he may expect to pay some penalty if his information turns out to be false. I do not doubt or take issue with the assertion that information supplied by a known informant is likely to be more credible than an unknown telephone tipster. That is simply not the issue here. The issue here is whether this tip was sufficient to justify the search of Linson simply because it came from a known informant who had given reliable information in the past. The majority argues that it was sufficient because nothing more is ever required when the tip comes from such an informant. I say this position is not supported by the case law, and that the actions taken by law enforcement personnel acting on tips, even tips coming from reliable confidential informants, must be evaluated in light of the totality of the circumstances. As previously stated in my quote from Adams, "tips, like all other clues and evidence coming to *Page 902 
a policeman on the scene, may vary greatly in their value and reliability."
¶ 46. Unlike the majority, I do not believe that either White,Neely or Floyd stands for the proposition that any tip from a reliable confidential informant will justify an investigatory stop. The difference between the tip here and the tips in White, Neely and Floyd is that here the tip contained no unique inside information indicating a "special familiarity with the affairs of the defendant," while in White, Neely, and Floyd such was the case. Indeed, here, the confidential informant did not even identify any of the individuals by name or other distinguishing features. Also, the informant did not give any specifics undergirding her conclusion that the individuals were selling drugs. In the case subjudice, the three black males could have been any three black males, and there is no way to know whether the three black males that Officer Farmer stopped were in fact the same three black males the informant said she saw. This was not the case with the defendants that were stopped inWhite, Neely and Floyd.
¶ 47. In our case, the officers had only generic information. It is unfortunate, but there is nothing unique about black males standing on a street corner. As stated, one of the officers had been told that the individuals were selling drugs; however, nothing that the officers saw indicated that was the case. I reiterate, if the officers had seen something pass between the individuals on the street and the occupants of the two cars that stopped, maybe that conduct would be suspicious enough to justify an investigative stop. According to Farmer's testimony, he was told only that three black males were standing on the corner. Cagle testified that the informant told him that the individuals were selling drugs. We cannot know whether the informant simply assumed as much because she saw the three individuals standing on the corner, or whether she had personal knowledge that drug dealings were taking place. Since the informant did not tell the officer the basis for her conclusion that drugs were being sold and since no drugs were found, it is a reasonably safe bet that the informant simply assumed that drug transactions were occurring.
¶ 48. In my judgment, the search of Linson was illegal, and the weapon should have been suppressed. For these reasons, I respectfully dissent.
KING, P.J., AND CHANDLER, J., JOIN THIS SEPARATE OPINION.