PARIENTE, J.,
specially concurring.
I concur in the majority’s approval of the Second District’s opinion in C.E.L. I write separately to address both the public policy concerns raised by this case and to point out additional legal and factual arguments for future cases that are not foreclosed by the majority opinion. While I recognize that this Court is required to follow the plain meaning of the statute, and generally cannot substitute its view of the better public policy choice,[9] I find this case to be extremely troubling because of its undeniable effect of adversely impacting teenagers who live in neighborhoods considered by the police to be “high-crime areas.” I strongly urge the Legislature to act to prevent the potential for disparate and unnecessary criminalization of otherwise innocent conduct that ultimately impacts those who live in “high-crime” areas differently than those who do not.
A. Concerns for Future Cases
Succinctly stated, the impact of Ward-low and its application to section 843.02 is *1190 to criminalize an act of resistance following flight that occurs in what is termed a “high-crime” neighborhood. The fact that empirical studies support a conclusion that certain juveniles and adults may be more distrustful of and more likely to flee from police, regardless of guilt, raises additional concerns for the adverse impact on minorities.
These concerns are compellingly laid out by the Second District in Judge Alten-bernd’s concurring opinion in C.E.L. and Justice Stevens’ concurring-in-part and dissenting-in-part opinion in Wardlow. I share these concerns. In C.E.L., Judge Altenbernd argued that the combination of the Wardlow decision, section 843.02, and the inclinations of the typical teenage mind, “creates a recipe for police tactics that can only exacerbate racial and socioeconomic tensions in the communities of this state.” C.E.L., 995 So.2d at 563 (Al-tenbernd, J., concurring). After all, C.E.L. was in this “high-crime neighborhood” because it was his home and teenagers living in a different neighborhood “would have been free to run when they saw the deputies.” Id. at 563-64. On this point, Judge Altenbernd emphasized that there were no signs warning individuals they were in “a region with reduced Fourth Amendment rights” and that the neighborhood had not been classified as a “high-crime area” by some objective statistical measurement but only by the subjective testimony of individual law enforcement officers. Id. at 564. Moreover, this case was particularly troubling because it involved a juvenile, who may have had an entirely innocent motivation to flee from police officers.[10] To explain further, Judge Altenbernd observed:
The fact that this case involves juveniles is significant to me. It is arguably suspicious if a thirty-five-year-old woman decides to run when she sees a police officer at 8:50 p.m. in her neighborhood. It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor. The simple truth is that any good police officer with a year’s experience can conduct herself in a manner that causes many typical teenagers to run under these circumstances. The experienced officer can order a teenager to stop in a manner that will not convince many teenagers to stop. In other words, a well-trained law enforcement officer has the ability to arrest many teenagers almost at will during the evening hours in a bad neighborhood.
Id. (emphasis added). Finally, Judge Al-tenbernd conveyed his apprehension regarding the future impact of C.E.L.) specifically, he “fear[ed] there [would be] consequences for our communities if we allow the sale of drugs in poor and ethnic minority neighborhoods to transform those neighborhoods into ‘high-crime neighborhoods’ where the Bill of Rights means something less than what the original framers intended it to mean for all free people.” Id.
In Wardlow, Justice Stevens conveyed similar concerns. He proposed that “[t]he question ... concerns the ‘degree of suspicion that attaches to’ a person’s flight-or, more precisely, what ‘commonsense conclusions’ can be drawn respecting the motives behind that flight.” Wardlow, 528 U.S. at 128, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Whereas Judge Altenbernd seemed troubled by C.E.L.’s impact on poor, minority teenagers, Justice Stevens reasoned that Wardlow’s failure to consider other “inno *1191 cent” and “understandable” motives for flight could predictably impact innocent minorities in general. Wardlow, 528 U.S. at 132, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Citing numerous empirical studies, he explained:
Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer’s sudden presence. For such a person, unprovoked flight is neither “aberrant” nor “abnormal.” ... [Furthermore,] the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.
Id. at 132-34, 120 S.Ct. 673 (footnotes omitted). Considering these factors and “[g]iven the diversity and frequency of possible motivations for flight ... [t]he inference we can reasonably draw about the motivation for a person’s flight ... will depend on a number of different circumstances.” Id. at 129, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part).
The concerns expressed by Judge Alten-bernd and Justice Stevens are founded on two premises. First, an individual’s location within a high-crime area may be outside that individual’s control, i.e., it could be the only place a person can afford to live. And second, an individual’s motivation for flight may be entirely innocent.
As to the first consideration, Judge Al-tenbernd highlighted that in C.E.L.’s case, he was not in the high-crime area by choice, rather, “it was his home.” See C.E.L., 995 So.2d at 563-64 (Altenbernd, J., concurring) (“This teenager lives with his mother about a mile from where he was arrested. In other words, he was in a ‘high-crime neighborhood’ because it is his home.”). Moreover, Judge Altenbernd highlighted how “high-crime areas” may be related to “poor and ethnic minority neighborhoods.” See id. at 564 (“It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor.”). Relying on Judge Altenbernd’s correlation, the unintended consequence of today’s holding is its effect on poor and ethnic minority neighborhoods designated as “high-crime areas.” Notably, if this occurred several miles away, in an area where crime or drug activity was perhaps not so prevalent, C.E.L. would have been free to do the “crime” for which he was charged and remain unscathed.
The second consideration is the disturbing conclusion reached in Wardlow that “headlong flight” in a “high-crime neighborhood” is an act of evasion giving rise to reasonable suspicion. See Wardlow, 528 U.S. at 124, 120 S.Ct. 673. However, it is possible that rather than an act of evasion, C.E.L.’s flight could have been legitimately based on some other reason, such as a well-founded fear of police, his age, or both. As Justice Stevens observed, minorities and those residing in high-crime areas may flee upon sight of police, not because of criminal activity, but because of a well-founded fear of police, rooted in a perceived mistreatment of minorities by the police. See id. at 132-33 nn. 7-10, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part).
As an article cited by Justice Stevens concludes, “Black leaders [have] complained that innocent people [are] picked up in the drug sweeps.... [And] [s]ome teenagers [are] so scared of the [police drug] task force that they run even if they *1192 weren’t selling drugs.” Id. at 133 n. 8,120 S.Ct. 673 (emphasis added) (quoting Kot-lowitz, Hidden Casualties: Drug War’s Emphasis on Law Enforcement Takes a Toll on Police, Wall St. J., Jan. 11,1991, at A2). Furthermore, additional research has indicated that “[yjoung minority males in particular are strongly motivated to avoid [the police]” and “strive to avoid running into the police, believing that such encounters are all too often the prelude to abuse.” Malcolm D. Holmes & Brad W. Smith, Race and Police Brutality: Roots of an Urban Dilemma 94 (2008) (emphasis added).
The bottom line is that I would urge the Legislature to consider whether statutory revisions to section 843.02 are necessary in order to address what is clearly an unintended consequence of the statutory scheme.
B. Arguments That Are Not Foreclosed by This Opinion
Although the majority’s conclusion is limited to the circumstances of this case, it is important to discuss several alternative arguments that are not foreclosed by the majority opinion. First, Wardlow does not establish a per se rule regarding the existence of reasonable suspicion; the existence of reasonable suspicion is judged by a totality of circumstances. Second, an individual prosecuted under section 843.02 can challenge whether his or her flight from police was “unprovoked” and “headlong.” Lastly, that individual can challenge whether the area of his or her alleged violation was actually within a “high-crime area.”
1. Wardlow Does Not Establish a Per Se Rule That Reasonable Suspicion Exists
The hallmarks of Wardlow’s holding are twofold. First, a suspect must be present in a high-crime location. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. And second, the suspect must engage in subsequent “unprovoked flight upon noticing the police.” Id. Both factors, when present, may provide an officer with reasonable suspicion that a crime had been or was about to be committed, inviting the officer to perform a lawful investigative stop. See id. at 124-26, 120 S.Ct. 673. However, other factors may be present that would dictate a finding that reasonable suspicion does not exist.
In deciding Wardlow, the United States Supreme Court continued to adhere to the totality of circumstances standard to hold that those two factors, if present, add to the total circumstances that might arouse an officer’s suspicion enough to justify a lawful investigatory stop. See Wardlow, 528 U.S. at 126,120 S.Ct. 673. Thus, while unprovoked flight and a suspect’s locale are relevant factors, they are not always indicative of a reasonable suspicion of criminal activity. Id. at 136, 120 S.Ct. 673 (Stevens, J., concurring in part and dissenting in part). Further, unprovoked flight may give rise to a reasonable suspicion of criminal activity, even when the flight does not take place in a high-crime area, depending on the remaining circumstances of the case.
In this case, the majority position does not foreclose future challenges to whether reasonable suspicion of criminal activity exists the moment an order to stop has been given — i.e., whether an officer’s order to stop was even lawful.[11] In other words, *1193 consideration of other factors, with which this Court was not presented, could have influenced the totality of the circumstances analysis and ultimate conclusion of reasonable suspicion. In his concurring-in-part opinion in Wardlow, Justice Stevens explained that motivation for a person’s flight depends on a variety of circumstances, including “[f]actors such as the time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the flight, and whether the person’s behavior was otherwise unusual.” Id. at 129-30, 120 S.Ct. 673. Therefore, other factors, when present, could affect whether a person’s flight in a high-crime area provides reasonable suspicion to justify a Terry stop.
2. Defendant Can Challenge Whether There Was Unprovoked Headlong Flight
An individual prosecuted under section 843.02 can also challenge whether his actions constituted the type of “unprovoked” and “headlong” flight from police that Wardlow described. As the majority in the instant case noted, the Wardlow Court found that a defendant’s sudden exodus upon noticing police in the area was unprovoked, headlong flight. See 528 U.S. at 124-25, 120 S.Ct. 673. Although the Court’s description explains what unprovoked, headlong flight may suggest to an approaching officer, it provides no clear guidance on how to identify when such flight is either unprovoked, headlong, or both. Therefore, whether flight constitutes “the consummate act of evasion” is left for other courts to resolve, when that issue is properly raised. In this case, the State asserts that C.E.L.’s flight upon noticing the officers’ approach was “unprovoked” and “headlong.” C.E.L. does not challenge this classification and fails to distinguish this case from Wardlow, so that issue was not preserved for our review in this case.
However, whether an individual’s flight from police fits within the Wardlow framework is an issue that may still be examined. In fact, several of Florida’s district courts have considered such challenges. For example, in Lee v. State, 868 So.2d 577 (Fla. 4th DCA 2004), the Fourth District addressed whether there were sufficient facts to support a reasonable suspicion of criminal activity to warrant a lawful investigatory stop. Id. at 580. In Lee, police officers arrived at a street corner in an area known for illegal drug activity after responding to an anonymous phone tip. Id. Upon noticing the officers, the suspects on the street corner “dispersed” in different directions. Id. When officers noticed the defendant “quickly walking away from the area,” they detained him and subsequently seized contraband that the defendant had dropped prior to his detainment. Id. at 579-80. The Fourth District found that the contraband was illegally seized because Wardlow was inapplicable for establishing reasonable suspicion. Lee, 868 So .2d at 582. “The factor missing in the instant case [was] that there [was] no evidence of flight and certainly no evidence of ‘headlong flight.’ ” Id. at 581-82. In fact, the most that could be said was that the defendant was “walking quickly,” and “[t]here was no evidence presented that [the defendant] acted ‘nervous’ or engaged in ‘evasive behavior.’ ” Id. at 582. And “al *1194 though [the defendant] was in an area known for numerous arrests ..., he did not flee upon the arrival of law enforcement .... [H]e ‘dispersed’ ... [or] ‘walked quickly.’ ” Id. at 582-88. Therefore, “[u]nder the totality of circumstances there [were] insufficient facts to support a reasonable suspicion that [the defendant] was engaged in criminal activity” and the investigatory stop was unlawful. Id. at 582.
When faced with a similar question, the Second District, in Cunningham v. State, 884 So.2d 1121 (Fla. 2d DCA 2004), held that because no evidence established that the defendant actually observed the police before flight, the trial court erred when it applied Wardlow to deny the defendant’s motion to suppress. Id. at 1121-23. In Cunningham, a sheriffs deputy patrolling a residential area noticed a small group of people standing outside a parked car with illuminated brake lights. Id. at 1121-22. The area was not known for being a high-crime area, but a number of burglaries had recently occurred there. Id. at 1122. To investigate further, the deputy turned down the street, and from a distance of seventy-five to a hundred yards, “saw a person jump into the car and accelerate quickly.” Id. Without knowing whether the car’s passengers saw his approach, the deputy “activated his blue lights and stopped the car.” Id. The defendant, a passenger in the car, was searched and arrested for possession of cocaine. In finding that a well-founded suspicion did not exist for a stop and search to occur, the Second District explained that “the facts surrounding [the defendant’s] departure from the scene [did] not rise to the level of ‘headlong flight’ ” contemplated by Wardlow. Cunningham, 884 So.2d at 1122.“There was no evidence that [the defendant] or the driver actually observed the police before the car left the area, which in [the court’s] view [was] a critical factor.” Id. at 1122-23. Moreover, although the deputy “was in a marked vehicle, it [was] not clear whether the suspects could have identified it as such.” Id. at 1123. Thus, the district court concluded that the trial court erred in applying Wardlow and reversed the denial of the defendant’s motion to suppress. Id. at 1124.
As Lee and Cunningham indicate, future challenges may raise the point that a defendant failed to see the officer approach or that his actions in moving away from the officer did not constitute headlong and unprovoked flight.
3. Defendant Can Challenge Whether the Incident Occurred Within a “High Crime Area”
Finally, an individual can challenge whether the area where his or her alleged violation occurred was actually within a “high-crime area.” In Wardlow, the United States Supreme Court held that “officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation ... [under] a Terry analysis.” Wardlow, 528 U.S. at 124, 120 S.Ct. 673 (citing Adams v. Williams, 407 U.S. 143, 144, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Applying that logic, the Court labeled the defendant’s location on a public street in an area known by the Chicago Police Department for heavy narcotics trafficking as a “high-crime area.” Id. However, Wardlow does not provide a uniform method by which to distinguish areas of “high crime” and areas of “low” or “no crime.”[12] In this case, the State *1195 argued and submitted testimony to establish that the apartment complex where C.E.L. was detained was, in fact, a “high-crime area.” The detaining officers were patrolling the neighborhood in response to a prior complaint regarding drugs and trespassing. On appeal, C.E.L. did not contest this designation, but Judge Alten-bernd expressed concern that the classification lacked “objective statistical measurement” and was based solely on “the subjective testimony of individual law enforcement officers.” C.E.L., 995 So.2d at 564 (Altenbernd, J., concurring).
Other district courts have also discussed the type of evidence the State must present to prove that flight did, in fact, occur in a high-crime area. For example, in Cunningham, the facts of which are set forth above, the Second District defined a “high-crime area” as one “being riddled with narcotics dealings and drug-related shootings.” 884 So.2d at 1122. In Cunningham, the court ultimately concluded the neighborhood in which an investigative stop occurred was a “high-crime area” even though it was not known to have a high crime rate. Id. In reaching this conclusion, the Second District explained that “a number of burglaries had recently occurred there” and this “recent unlawful activity ... arguably was a pertinent factor justifying the deputy’s increased suspicion.” Id.
The Second District addressed this issue again in D.R. v. State, 941 So.2d 536 (Fla. 2d DCA 2006). In D.R., the police first saw the defendant, a juvenile, when she was walking in the middle of the street in an area without sidewalks. Id. at 537. When the defendant first noticed police officers driving alongside her, she began to run away. Id. The officers then chased the defendant on foot, calling out for her to stop and return to them, which she did. Id. At that point, one of the officers observed a baggie of marijuana in her mouth, and then demanded that she remove it. Id. Although both parties agreed that Wardlow controlled this situation, and that the defendant’s flight was unprovoked, in the defendant’s motion to suppress, she challenged the State’s contention that it proved her flight occurred in a “high-crime area.” Id.
Before reaching a conclusion, the Second District explained that “[o]n cross-examination, the officer provided no details regarding the number of arrests in the neighborhood ... [and] his knowledge of the area was unsupported by any facts shared with the court that would suggest that the suspect’s unprovoked flight occurred in a high crime area.” Id. at 538. Moreover, “there was no testimony about the ‘relevant characteristics’ of the location that would determine ‘whether the circumstances [were] sufficiently suspicious to warrant further investigation.’ ” Id. (quoting Wardlow, 528 U.S. at 124, 120 S.Ct. 673). These factors led the Second District to hold that “the officer’s out-of-date conclusion, unreinforced by specific, contemporary information, was legally insufficient to satisfy the Fourth Amendment.” Id. (footnote omitted). Notably, the D.R. court stated that “[although arrest statistics or information provided by regular police departmental briefings might be sufficient, [it did] not decide the nature or type of evidence necessary to establish an area as a high crime area, as that issue [was] not before [the court].” Id. at 538 n. 2. Thus, Z).fit's holding was limited to its conclusion that “there was no competent *1196 evidence to prove this [high-crime area] requirement in this case.” Id.
In this case, I agree with the majority that based on Wardlow and C.E.L.’s concession that reasonable suspicion existed at the time the officers ordered him to stop, the Second District properly affirmed C.E.L.’s adjudication under section 848.02. However, I remain troubled by the ultimate impact of this decision and stress that under a different factual scenario Wardlow may not apply and may not support a basis for a conviction for resisting without violence.
LABARGA and PERRY, JJ., concur.

. See, e.g., Tillman v. State, 934 So.2d 1263, 1270 (Fla.2006) ("[I]t is not this Court's function to substitute its judgment for that of the Legislature as to the wisdom or policy of a particular statute.” (quoting State v. Rife, 789 So.2d 288, 292 (Fla.2001))).

. For example, in D.T.B., it appears the juvenile's motivation for flight was entirely innocent. In that case, the juvenile's sole offense was the obstruction charge. Conversely, in C.E.L., in addition to the obstruction charge, the juvenile also had an outstanding warrant.

. A challenge such as this was raised in C.H.C. v. State, 988 So.2d 1145 (Fla. 2d DCA 2008). There, a deputy attempted to detain a juvenile who was walking in a circle, clenching his fists, and yelling profanities. The Second District held that the behavior was not sufficient to create reasonable suspicion of criminal activity and, thus, the juvenile's *1193 flight could not support a charge of obstructing or opposing an officer. Id. at 1147. C.H.C. is factually distinguishable from C.E.L. In C.H.C., there was no evidence that the officer had the founded suspicion to justify the detention, and therefore, as the court in C.H.C. notes, the flight in that case occurred after an unlawful order to stop and not prior to a lawful order as in Wardlow Id.

. In fact, "the Supreme Court left the question open in Wardlow, basing its holding on an assumed but undefined factual issue." Andrew Guthrie Ferguson & Damien Bernache, *1195 The “High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis, 57 Am. U.L.Rev. 1587, 1622-23 (2008).